Page 1108
726 P.2d 1108
55 USLW 2314
The PEOPLE of the State of Colorado, Petitioner-Appellee, In
the Interest of M.M., a Child,
and concerning C.M., Respondent-Appellant.
No. 85SA277.
Supreme Court of Colorado,
En Banc.
Oct. 20, 1986.
 Martin A. Mansfield, Jr., Englewood, Guardian Ad Litem, for Minor child.
 Carl E.K. Johnson, Denver, for respondent-appellant.
 Raymond C. Frenchmore, Littleton, for Dept. of Social Services.
 QUINN, Chief Justice.
 The appellant, C.M., appeals a judgment terminating her parental rights with respect to M.M., her seven year old son. C.M. challenges the constitutionality of certain provisions of the Parent-Child Legal Relationship Termination Act of 1977, §§ 19-11-101 to -110, 8B C.R.S. (1986), and also raises several other claims in connection with various rulings made by the juvenile court during the proceedings below. 1 We affirm the judgment.
I.
 A review of the events leading up to the termination order provides the factual context for the issues raised in this appeal. M.M. was born on June 13, 1977. On December 20, 1982, the Arapahoe County Department of Social Services (department) received a protective services referral regarding M.M. 2 The department was informed that M.M. and his sister R.M. had been sitting in a fast-food restaurant for over an hour and a half without adult supervision and that M.M. had been in the restaurant on three consecutive days for long periods of time without supervision. M.M. and R.M. were escorted home by an officer of the Englewood Police Department and released to C.M., their mother. One week later, on December 27, 1982, M.M. became lost in a King Soopers store and was eventually returned to his mother. On December 29 M.M. left home at about 12:30 p.m. and did not return. His mother reported him as missing to the police at 8:00 p.m., and M.M. was eventually located by the Englewood Police Department at 9:00 p.m. at a shopping center. On January 17, 1983, M.M. was again taken into custody by the Englewood Police Department after he was found walking the streets at 9:45 in the evening.
 A hearing was held by the juvenile division of the Arapahoe County District Court on January 19, 1983, in order to determine whether M.M. should be provided temporary care and shelter outside the home. The court appointed a guardian ad litem for M.M. and an attorney to represent C.M., placed M.M. in the temporary care of the department, and then returned him to his mother following a second hearing five days later.
 On January 27, 1983, the department filed a petition alleging in pertinent part that M.M. was a dependent or neglected

child. The petition contained a notice that termination of the parent-child relationship is a possible remedy in the event of M.M.'s adjudication as a dependent or neglected child. 3 Approximately one week later M.M. was again taken into custody by the Englewood Police Department when he was found outside a bank at 10:00 p.m., having left C.M.'s care at about noon that day when they were shopping together. The court again authorized the department to place M.M. in foster care pending further hearing on the dependency petition.
 C.M. suffered from multiple sclerosis since the age of 21, and the court accordingly requested the Kempe Center for Prevention and Treatment of Child Abuse to examine her and to evaluate the effects of her condition on her parental capacity. Dr. David Jones, a psychiatrist, examined C.M. in April 1983 and concluded that she was suffering from an organic brain syndrome related to her multiple sclerosis and that this condition adversely affected her ability to protect and care for M.M.
 On January 10, 1984, after conducting a hearing on the dependency petition, the court adjudicated M.M. a dependent or neglected child, ordered that temporary custody of the child remain with the department, and approved a treatment plan calculated to assist C.M. in the development of proper parenting skills. The treatment plan contained the following conditions: C.M. was to attend weekly training sessions conducted by the department on parenting skills; she was to continue with treatment for her multiple sclerosis; she was also to provide adequate supervision for her son M.M. when the son was placed in her temporary care by the department; and C.M.'s mother was to move into C.M.'s home and assist her with supervision of the child.
 The department and the guardian ad litem agreed to return the child to the care of C.M. on February 18, 1984. The treatment plan worked fairly well under this new arrangement until C.M.'s mother reported to the department that C.M.'s boyfriend, V.G., was creating problems. According to the grandmother, V.G. was drunk whenever he came to the house, and on one occasion he asked the grandmother to leave the house and physically abused her in front of the child. The grandmother also told the department that V.G. would leave for a couple of days at a time but always returned because he had no other place to stay. M.M. told the department case worker that he was afraid of V.G., that V.G. had spanked him on one occasion, that V.G. was living in the family home and frequently drank, and that V.G. often argued with C.M. while in the home. Although C.M. denied that V.G. was living in the home or that he drank while visiting her, she could offer no explanation for her son's statements and those of her mother other than that she thought her mother was "crazy." Because of the situation in the home, C.M.'s mother moved out without notice on March 30, 1984, and would not return due to her fear of V.G.
 On April 11, 1984, the department's child protection caseworker, Ronda Miescke, visited C.M. at home but found no one there. An investigation by the caseworker disclosed the following events: that C.M. had permitted M.M. to remain home from school and to visit a friend on the next block with instructions to return home by

5:00 p.m.; that when M.M. had not returned by 7:00 p.m., C.M. went looking for him, but, not knowing the friend's address, had to go to several homes before locating the friend whom M.M. had visited; that the friend's family informed C.M. that M.M. had left their home late that morning; that at approximately 9:15 p.m. C.M. reported to the Englewood Police Department that M.M. was missing; and at 10:15 p.m. M.M. was discovered asleep in his home, having arrived there sometime after C.M. went out looking for him. After this incident the court again returned M.M. to the custody of the department for placement in foster care and permitted the child to visit weekly with his mother and to make regular phone calls to her. C.M. in the meantime continued to attend the weekly training sessions conducted by the department.
 At a review hearing on June 14, 1984, the department informed the court that it intended to file a motion for termination of the parent-child legal relationship. The court requested Dr. Jones to re-evaluate C.M. and set a termination hearing for October 24, 1984. The department filed the termination motion with the court on September 21, 1984, pursuant to section 19-11-103(1), 8B C.R.S. (1986), which requires that such motion be filed at least thirty days before the hearing. C.M.'s attorney received a copy of the termination motion on October 2, 1984. Because the motion was received less than thirty days prior to the hearing, C.M.'s counsel on October 22, 1984, requested a continuance of the case. This motion was denied.
 At the outset of the termination hearing on October 24, 1984, C.M.'s counsel again moved for continuance on several grounds and also requested the court to appoint a guardian ad litem for C.M., claiming that C.M. lacked the mental capacity to understand the nature of the proceedings and was unable to assist counsel in asserting and protecting her interests. The court again denied the motion for continuance, noting that C.M. and her attorney had been aware since June 14 that the termination hearing was set for October 24. The court also denied the motion to appoint a guardian ad litem for C.M. In so ruling, the court observed that if C.M.'s attorney believed that C.M. was in need of a guardian ad litem he should have made that request much sooner, especially since C.M. had been his client for approximately two years. The court then took a brief recess. During the recess C.M. placed on the judge's bench a letter written by her the previous day. In the letter C.M. requested the court to continue her case so that she could find a new lawyer because in her opinion her court-appointed attorney had not adequately represented her. Upon learning of the contents of C.M.'s letter, C.M.'s attorney requested permission to withdraw from the case and again renewed his request for the appointment of a guardian ad litem. The court denied both requests, noting that C.M.'s attorney was very familiar with the facts of the case and had competently represented her during previous proceedings.
 The termination hearing commenced with testimony from Dr. Jones concerning his examinations of C.M. He testified that C.M.'s condition remained virtually unchanged from his prior evaluation in April 1983. In the doctor's opinion, C.M.'s illness somewhat impaired her understanding of the seriousness of her condition. The doctor, for example, described how C.M. would say that she was better than ever and that her doctors and therapists agreed with her when in fact they did not. Dr. Jones also testified that the child, M.M., needed consistent and reliable parenting on a daily basis, that he needed to develop bonds with his primary caretaker, and that C.M. could not be rehabilitated into an effective parent. The doctor also described an abnormal role reversal between C.M. and M.M.--M.M. being concerned for his mother's welfare and attempting to entertain her and C.M. being emotionally unavailable to attend to M.M.'s needs. It was the doctor's opinion that C.M.'s condition was not amenable to treatment or reversal and that her parental rights should be terminated.
 The department's child protection caseworker also testified and identified her investigative

report which had been previously filed with the court and was admitted into evidence at the hearing. The report indicated that C.M. had a history of involvement with men that were abusive to herself and her children, that she had not fulfilled the treatment plan and would not be able to do so in the reasonable future, that M.M. was in dire need of structured parenting and was comfortable in his foster home, and that M.M. was not opposed to the idea of adoption but was quite concerned about his mother. The caseworker described her efforts to locate someone who might live with C.M. and M.M. and function as M.M.'s primary caretaker, but stated that such efforts were unsuccessful primarily because none of the foster homes in Arapahoe County would be willing to take in both C.M. and M.M. under those circumstances. It was the caseworker's opinion that C.M. would never be able to provide adequate care for M.M. and that the parent-child relationship should be terminated.
 C.M. testified that the department's motion to terminate was unjustified. She stated that she was not disabled, could take care of her own home without help, and was willing to care for her son. She further testified that she wanted to retain her parental relationship with M.M. but that she could accept an order of termination as long as she was able to visit M.M.
 The trial court took the matter under consideration and issued a written decree on November 19, 1984. The court found by clear and convincing evidence that an appropriate treatment plan had been approved by the court but had not been successful, that C.M.'s physical and mental condition rendered her an unfit parent, that C.M.'s condition is unlikely to change within a reasonable time, that it is unlikely that she will be able to provide M.M. with reasonable parental care in the future, and that permanent foster care would not be in M.M.'s best interest. Concluding that "[u]nder no circumstances would the welfare of the minor child be served by a continuation of the parental relationship," the court terminated the parent-child relationship. The court, as part of the termination decree, initially ordered the department to provide counseling for C.M. and M.M. and to allow some contact between them over the next few years. M.M.'s guardian ad litem, however, requested the court to amend the termination decree by deleting the continuing-contact provision with respect to C.M. and M.M. The guardian ad litem contended that a termination eliminates all visitation rights and that the provision for continuing visitation would eliminate any possibility of adoption for M.M. The court on February 7, 1985, acceded to the guardian ad litem's request and deleted the provision. This appeal followed.
 C.M. urges us to reverse for the following reasons: that section 19-11-103(1), 8B C.R.S. (1986), violates due process of law by not expressly requiring that the motion for termination or notice of its filing be served on the parent; that the department's failure to serve a copy of the motion on C.M.'s counsel until eleven days after the filing of the motion violated C.R.C.P. 5(d) and rendered the order of termination invalid; that section 19-11-103(3), 8B C.R.S. (1986), violates equal protection of the laws by requiring the appointment of a guardian ad litem for a parent who is a minor but not requiring a guardian ad litem for a parent who is disabled; that the court abused its discretion in refusing to appoint a guardian ad litem for C.M. due to her mental disability; that the court erred in denying C.M.'s motion for a continuance and her request to discharge her attorney, and also erred in denying her attorney's request to withdraw; that the treatment plan approved by the court was inappropriate; that the evidence was insufficient to support the order of termination; that the court erred in failing to require the department to implement less drastic alternatives to termination; and that the court erred in amending the order of termination so as to eliminate post-termination visitation between C.M. and M.M.
II.
 We first address C.M.'s claim that section 19-11-103(1), 8B C.R.S. (1986), violates

due process of law, U.S. Const. amend. XIV; Colo. Const., art. II, sec. 25, by failing to require that a parent be served with a copy of the termination motion or that a parent at least be notified of its filing. We reject C.M.'s constitutional challenge.
 Section 19-11-103(1) provides as follows:
Termination of a parent-child legal relationship shall be considered only after the filing of a written motion alleging the factual grounds for termination, and termination of a parent-child legal relationship shall be considered at a separate hearing following an adjudication of a child as dependent or neglected. Such motion shall be filed at least thirty days before such hearing. (emphasis added).
 Although section 19-11-103(1) contains no express requirement that a parent be served with a termination motion or be otherwise notified of its filing, due process requires that a parent be provided with adequate notice of a termination hearing and an opportunity to protect her interests at the hearing itself. People In the Interest of E.A., 638 P.2d 278 (Colo.1982); Robinson v. People, 173 Colo. 113, 476 P.2d 262 (1970). C.M. was entitled to adequate notice that the department was seeking termination of her parental rights and that a termination hearing would be held on a certain date. The fact that a parent is entitled to notice, however, does not mean that statutory silence on the issue of notice is itself a constitutional infirmity.
 The record here clearly shows that as of June 14, 1984, both C.M. and her attorney were expressly advised by the court that a termination hearing was set for October 24, 1984, thereby providing them with more than four months in which to prepare for the hearing. The factual grounds for the termination motion were set out in the motion itself, which was served on C.M.'s counsel on October 2, approximately three weeks prior to the termination hearing. Moreover, from January 1983 through June 1984, C.M. and her attorney were involved in various hearings related to the dependency of M.M. and the treatment plan for C.M., all of which provided C.M. with explicit information about her parental inadequacies and the real risk that her parental rights would be terminated in the event those inadequacies were not effectively remedied. Finally, the record unequivocally establishes that C.M. was afforded a full opportunity to be heard at the termination hearing and to present evidence in contravention of the department's motion. Under these circumstances, we are satisfied that C.M. was accorded due process of law in the termination proceedings. 4
III.
 We next consider C.M.'s claim that the department's failure to serve a copy of the termination motion within forty-eight hours after filing such motion violated Rule 5(d) of the Colorado Rules of Civil Procedure and thereby rendered the termination order invalid. We conclude that the department was required to comply with C.R.C.P. 5(d) and failed to do so, but that its failure to comply was harmless error.
 C.R.C.P. 5(d) states:
In all cases where these rules do not expressly require the filing and service of a paper, subsequent to the original complaint, and the filing of a paper alone is provided for, a copy of such paper so filed shall be served upon the adverse party either prior to such filing, or within forty-eight hours thereafter, and where the service alone of any paper is required it shall be filed either before service or within a reasonable time thereafter.
 It might be argued that Rule 5(d) has no application to this case because Rule 6(b) of

the Colorado Rules of Juvenile Procedure, which section 19-1-107(1), 8B C.R.S. (1986), makes expressly applicable to a proceeding for the termination of parental rights, requires that once jurisdiction has been acquired over the parties any "subsequent pleadings and notice may be served on such parties by regular mail" but contains no specific time period within which service must be accomplished. We believe, however, that C.R.C.P. 5(d) does apply to a motion to terminate parental rights.
 A proceeding to terminate parental rights is a civil proceeding, People in the Interest of C.A.K., 652 P.2d 603 (Colo.1982), and Rule 1 of the Colorado Rules of Juvenile Procedure states that the Colorado Rules of Civil Procedure shall apply to a juvenile proceeding not expressly governed by the juvenile rules or the Colorado Children's Code. Since Rule 6 of the Colorado Rules of Juvenile Procedure contains no time period for effectuating service, it is appropriate to ask whether a motion for termination of parental rights is subject to the provisions of C.R.C.P. 5.
 The specific question thus becomes whether a motion to terminate parental rights is a "paper" within the purview of Rule 5(d) of the Colorado Rules of Civil Procedure. While the word "paper" in Rule 5(d) might be considered a reference to those documents described in Rule 5(a) as "every paper relating to discovery," 5 we believe such an interpretation would contravene the overriding purpose intended by Rule 5(d), which is to advise an adverse party of any action taken by an opposing party in pending litigation. 6 This purpose is accomplished by requiring a party who files a paper to serve a copy of such paper on the adverse party not later than forty-eight hours after the filing. Pursuant to Rule 5(b), "[s]ervice by mail is complete upon mailing."
 In light of the fact that Rule 6(b) of the Colorado Rules of Juvenile Procedure is silent on the time period within which a motion to terminate parental rights should be served on the natural parent, and considering the significance of the filing of such a motion to the natural parent, we believe it appropriate to apply the service requirements of C.R.C.P. 5(d) to a motion for termination of parental rights. We conclude, therefore, that C.M. was entitled

to be served with a copy of the termination motion within forty-eight hours of its filing on September 21, 1984.
 Although the record does not show when the department placed the motion for termination in the mail for service on C.M., the late receipt of the motion by C.M.'s attorney on October 2, 1984, is rather persuasive evidence that the department failed to mail the motion within forty-eight hours of its filing. We accordingly assume, for purposes of this appeal, that the department did not comply with C.R.C.P. 5(d). Although the department should have taken steps to ensure that C.M. received notice of the termination motion sooner than October 2, 1984, we are satisfied that the department's noncompliance with C.R.C.P. 5(d) did not affect the validity of the order of termination. C.M. was made aware at the review hearing on June 14, 1984, at which both she and her attorney were present, that the department intended to file a motion to terminate parental rights and that the termination hearing was being set for October 24, 1984. Moreover, C.M. was served with the motion for termination on October 2, 1984, twenty-two days prior to the hearing itself. Under these circumstances, the department's failure to comply with the forty-eight hour service requirement of C.R.C.P. 5(d) did not affect the substantial rights of C.M. and must accordingly be deemed harmless error.
IV.
 We turn to C.M.'s argument that section 19-11-103(3), 8B C.R.S. (1986), denies her equal protection of the laws, U.S. Const. amend. XIV; Colo. Const. art. II, sec. 25, 7 because the statute requires the appointment of a guardian ad litem in a termination proceeding for any parent who is a minor but not for a parent who is mentally disabled. C.M.'s argument is unconvincing.
 Section 19-11-103(3), 8B C.R.S. (1986), states that "[i]f a respondent parent is a minor, a guardian ad litem shall be appointed and shall serve in addition to any counsel requested by the parent." If, however, the parent is an adult but nonetheless suffers from a mental disability, the appointment of a guardian is vested in the discretion of the court. Section 19-3-105(2), 8B C.R.S. (1986), states in this respect that "[t]he court may appoint a guardian ad litem for any parent in [a termination proceeding] who has been determined to be mentally ill by a court of competent jurisdiction or is developmentally disabled."
 "The right to equal protection of the laws guarantees that all parties who are similarly situated receive like treatment by the law." J.T. v. O'Rourke, 651 P.2d 407, 413 (Colo.1982). There are a wide variety of mental disabilities. Our statutes, for example, refer to persons who are insane, mentally ill or gravely disabled, and developmentally disabled. See § 27-10.5-135, 11 C.R.S. (1986 Supp.). Persons encompassed within such categories do not necessarily act under the same restriction as minors. See § 27-10-125, 11 C.R.S. (1982 & 1986 Supp.) (statutory requirements for the imposition of a legal disability on a person who is mentally ill, gravely disabled, mentally retarded, developmentally disabled, or insane). A person who labors under some degree of mental impairment is not necessarily legally incompetent to sue or be sued. A mentally retarded person, for example, might be fully capable of making one type of decision but incapable of making another. See Roos, The Law and Mentally Retarded People: An Uncertain Future, 31 Stan.L.Rev. 613, 617 (1979). A minor, however, is not legally competent to sue or be sued without a guardian ad litem or other like fiduciary representing the minor. § 13-22-101(1)(c), 6 C.R.S. (1973); C.R.C.P. 17(c). Because there are real differences between the respective disabilities and legal incapacities of mentally disabled persons on the one hand and minors on the other, there is no constitutional requirement

that these categories of persons be treated exactly the same way. The legislative decision to provide for separate standards regarding the appointment of a guardian ad litem for these categories of persons does not violate equal protection of the laws.
V.
 C.M. further contends that, regardless of whether the appointment of a guardian ad litem is a matter of statutory right or discretion, the trial court abused its discretion when it refused to make such appointment in this case. We find no abuse of discretion here.
A.
 As previously noted, section 19-3-105(2), 8B C.R.S. (1986), does not mandate the appointment of a guardian ad litem in a termination proceeding for an adult parent who is mentally disabled, but rather reposes the matter in the discretion of the court by stating that "[t]he court may appoint a guardian ad litem for any parent ... who has been determined to be mentally ill by a court of competent jurisdiction or is developmentally disabled." Section 27-10-102(7), 11 C.R.S. (1986 Supp.), defines a mentally ill person as "a person with a substantial disorder of the cognitive, volitional, or emotional processes that grossly impairs judgment or capacity to recognize reality or to control behavior," and further states that "mental retardation is insufficient to either justify or exclude a finding of mental illness." Section 27-10.5-102(10)(a), 11 C.R.S. (1986 Supp.), defines a developmental disability as:
a disability that is manifested before the person reaches twenty-two years of age; constitutes a substantial handicap to the affected individual; and is attributable to mental retardation or related conditions which include cerebral palsy, epilepsy, autism or other neurological conditions when such conditions result in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons.
 Although section 19-3-105(2) is cast in terms of judicial discretion with respect to two categories of disability mentioned in the statute--a parent adjudicated mentally ill and a parent who is developmentally disabled--we do not believe the legislature intended this section as the outer limit of a court's authority to appoint a guardian ad litem for an adult parent in a termination proceeding. There might well be circumstances where a parent's capacity for rational decision-making is substantially impaired but the parent may not satisfy the legal criteria of section 19-3-105(2). One such example is a parent who is in fact mentally ill at the time of the termination hearing--that is, who is suffering from "a substantial disorder of the cognitive, volitional, or emotional processes, resulting in gross impairment of judgment or capacity to recognize reality or control behavior," § 27-10-102(7), 11 C.R.S. (1986 Supp.)--but who has not been formally adjudicated a "mentally ill person" pursuant to the statutory scheme governing the care and treatment of the mentally ill. §§ 27-10-101 to -129, 11 C.R.S. (1982 & 1986 Supp.). Another example is a parent whose condition fluctuates intermittently between gross mental impairment and normalcy. A third example is a parent who is suffering from a significant mental impairment, but the court is simply unable to determine whether the nature and extent of the impairment has resulted in a "gross" impairment of the parent's mental capacity.
 The principle is well established that irrespective of statutory authorization it is proper for a court to appoint a guardian ad litem for a litigant when the court is reasonably convinced that the party is not mentally competent to effectively participate in the proceeding. Graham v. Graham, 40 Wash.2d 64, 240 P.2d 564, 565 (1952). We have recognized, at least implicitly, this principle in several of our decisions. See Southard v. Miles, 714 P.2d 891, 900 n. 11 (Colo.1986) (court may appoint guardian ad litem for personal injury plaintiff whose mental competency is in question); People v. Medina, 705 P.2d 961,

972 n. 8 (Colo.1985) (court in its discretion may appoint guardian ad litem for involuntarily committed patient represented by counsel, if guardian ad litem would be of assistance to the patient or the patient's attorney in hearing to determine whether antipsychotic medication should be administered to patient over patient's objection); Public Service Co. v. Barnhill, 690 P.2d 1248, 1251-52 (Colo.1984) (court may appoint guardian ad litem for a party who is mentally or physically incapacitated to extent of being unable to effectively represent interests that might be adversely affected by the litigation). We read section 19-3-105(2), therefore, as a legislative grant of statutory authority for a court to exercise its discretion in appointing a guardian ad litem when the parent has been adjudicated mentally ill and also when the parent is developmentally disabled, such appointment to be at state expense if the parent is indigent, but we do not interpret the statute as a prohibition on a court's discretionary power to appoint a guardian ad litem for a mentally impaired parent who does not satisfy the statutory criteria when such appointment is necessary for the protection of the parent's legal interests.
 A court's discretionary authority to appoint a guardian ad litem in cases outside of the strict criteria of section 19-3-105(2) finds support in the Colorado Rules of Civil Procedure. Because a termination proceeding is civil in nature, e.g., C.A.K., 652 P.2d 603, and because there is no provision in the Colorado Rules of Juvenile Procedure directed to the appointment of a guardian ad litem in termination cases, it is appropriate to consider the provisions of C.R.C.P. 17(c) on this matter. 8 This rule states that "[t]he court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person." (emphasis added). Rule 17 does not contain a definition of an "incompetent person," but section 27-10.5-135(1), 11 C.R.S. (1986 Supp.) does. That section states that whenever the term "mental incompetent" is used in the laws of the state of Colorado, it shall refer to the "mentally ill or gravely disabled, as defined in section 27-10-102, or a person with developmental disabilities, as defined in section 27-10.5-102, as the context of the particular law requires."
 As previously noted, a "mentally ill person" is a person with a substantial disorder of the cognitive, volitional, or emotional processes, resulting in a gross impairment of judgment or capacity to recognize reality or to control behavior. § 27-10-102(7), 11 C.R.S. (1986 Supp.). The term "gravely disabled" is defined in section 27-10-102(5), 11 C.R.S. (1982), as:
a condition in which a person, as a result of mental illness, is unable to take care of his basic personal needs or is making irrational or grossly irresponsible decisions concerning his person and lacks the capacity to understand this is so. A person of any age may be "gravely disabled" under this definition, but the term does not include mentally retarded persons by reason of such retardation alone.
 While the term "incompetent person" in C.R.C.P. 17(c) is certainly broad enough to encompass statutory definitions of "mentally ill" and "gravely disabled" in section 27-10-102, we are satisfied that the term also includes those who, although not mentally ill to the extent of satisfying those statutory criteria, are nonetheless mentally impaired to the degree of being incapable of effectively participating in a termination proceeding and thus need the assistance of a fiduciary representative. When, as here,

the adult parent is already represented by an attorney, the appointment of a guardian ad litem pursuant to C.R.C.P. 17(c) is a matter left to the sound discretion of the court. Johnson v. Lambotte, 147 Colo. 203, 363 P.2d 165 (1965); 2 J. Moore & J. Lucas, Moore's Federal Practice p 17.26 at 17-280 (2d ed. 1986); 6 C. Wright & A. Miller, Federal Practice and Procedure § 1570 at 775-76 (1971).
B.
 In determining whether a court has abused its discretion in not appointing a guardian ad litem for an adult parent who is also represented by counsel, it is appropriate to consider the function of a guardian ad litem in relation to the role of counsel in a termination proceeding. While it is the lawyer's duty to provide the parent with legal advice on such decisions as whether to contest the termination motion and whether to present particular defenses to the motion, it is the role and responsibility of the parent to make those decisions. If the parent is mentally impaired so as to be incapable of understanding the nature and significance of the proceeding or incapable of making those critical decisions that are the parent's right to make, then a court would clearly abuse its discretion in not appointing a guardian ad litem to act for and in the interest of the parent. A court would also abuse its discretion in not appointing a guardian ad litem in those situations in which it is clear that the parent lacks the intellectual capacity to communicate with counsel or is mentally or emotionally incapable of weighing the advice of counsel on the particular course to pursue in her own interest. If, however, the evidence shows that a parent, although mentally disabled to some degree, understands the nature and significance of the proceeding, is able to make decisions in her own behalf, and has the ability to communicate with and act on the advice of counsel, then a court might well conclude, and properly so, that a guardian ad litem could provide little, if any, service to the parent that would not be forthcoming from counsel.
C.
 We are satisfied in this case that the trial court did not abuse its discretion in refusing the appointment of a guardian ad litem for C.M. While there was evidence establishing that C.M. first developed multiple sclerosis at the age of twenty-one and experienced some degree of mental impairment as a result of that condition, we cannot say that the overall state of the record on C.M.'s mental condition was such as to impose upon the trial court a mandatory duty to appoint a guardian ad litem. Several factors lead us to this conclusion.
 Although Dr. Jones testified that C.M. experienced some deterioration in her ability to understand the significance of her situation, there is no testimony indicating that C.M.'s condition rendered her "developmentally disabled" under section 27-10.5-102(10)(a), "mentally ill" under section 27-10-102(7), or "gravely impaired" under section 27-10-102(5). While the presence of any of these conditions might strongly support the exercise of judicial discretion in favor of the appointment of a guardian ad litem, we find none of them present here. Nor does the record show that C.M. was suffering from a mental impairment that rendered her incapable of effectively participating in the termination proceeding. On the contrary, the record contains abundant evidence that C.M. was fully aware of the nature and significance of the termination proceeding, was capable of making decisions in her own interests, and was capable of communicating and acting on the advice of her attorney. C.M.'s testimony at the termination hearing was articulate, precise, and quite responsive to each question. Acknowledging that she was fully aware of the department's effort to terminate the parent-child relationship, she stated that, although she wanted to take care of M.M., she would accept termination with visitation rights if that was the best she could obtain. The letter written by C.M. to the court on the day of the termination hearing further indicates her ability to make decisions affecting her own interests in the case and to communicate these decisions to

others. Finally, the trial court had the advantage of seeing C.M. at various stages of the proceedings and evaluating her general level of mental competency. We cannot conclude that under the state of the record before us the court abused its discretion in denying C.M.'s motion for a guardian ad litem.
VI.
 We now take up C.M.'s claim that the trial court erred in denying her motion for a continuance and her request to discharge her attorney, and also in denying her attorney's motion to withdraw. We find no error in the trial court's rulings on these requests.
 A motion for a continuance is generally addressed to the sound discretion of the trial court, e.g., People in the Interest of V.A.E.Y.H.D., 605 P.2d 916 (Colo.1980), as are a party's motion to discharge an attorney and an attorney's motion to withdraw, e.g., People v. Schultheis, 638 P.2d 8 (Colo.1981); Sobol v. District Court, 619 P.2d 765 (Colo.1980), and the court's ruling on such motions will not be disturbed on review in the absence of a clear abuse of discretion. In ruling on such motions, the trial court should consider the need for orderly and expeditious administration of justice and should balance that need against the particular facts underlying the motion. People v. Rubanowitz, 688 P.2d 231, 242-43 (Colo.1984). If the trial court has a reasonable basis for concluding that the lawyer-client relationship has not deteriorated to the point that counsel is unable to give effective assistance to his client, the court is justified in denying a client's request to discharge her attorney and a lawyer's request to withdraw. Schultheis, 638 P.2d at 15.
 In this case, C.M.'s motion for a continuance and her request to discharge her attorney and her attorney's motion to withdraw were made on the day of the scheduled termination hearing. Since C.M. had been represented by the same attorney for nearly two years, any newly appointed lawyer would have needed an adequate period of time to become acquainted with the history of the case in order to effectively assist C.M. If C.M.'s motions had been granted, therefore, the termination hearing would have resulted in substantial delay to the inconvenience of witnesses and the court and would have subjected M.M. to further uncertainty about his future. Furthermore, the trial court expressly noted in this case that C.M.'s counsel had competently represented her throughout the proceedings and was very familiar with the facts of the case. We are satisfied under the circumstances that the trial court did not abuse its discretion in refusing to continue the termination hearing, in denying C.M.'s request to discharge her attorney, and in denying her attorney's request to withdraw from the case.
VII.
 C.M. next asserts that the trial court had the responsibility of modifying the treatment plan after C.M.'s mother moved out of the home and that the trial court's failure to do so rendered the treatment plan inappropriate and the termination order invalid. We again are not persuaded by C.M.'s argument.
 A trial court, prior to terminating parental rights based on a dependency adjudication, must find either that an appropriate treatment plan has not been complied with or has not been successful or that an appropriate treatment plan could not have been devised. § 19-11-105(1)(b)(I), 8B C.R.S. (1986). The purpose of a treatment plan is to preserve the parent-child relationship, whenever possible, by assisting the parent in overcoming those problems which led to the dependency adjudication. The appropriateness of a treatment plan must be measured against the existing realities that culminated in the dependency adjudication and must be ultimately evaluated by examining the likelihood of success in accomplishing its purpose. The fact that the plan is not ultimately successful, however, does not mean that it was therefore inappropriate, for in many cases it is virtually impossible to devise a plan which will guarantee

success. See C.A.K., 652 P.2d at 611.
 While the decision of C.M.'s mother to move out of the home may have reduced the prospects for a successful completion of the plan by C.M., it simply does not follow that the plan was thereby rendered inappropriate. The plan's success was not dependent so much upon C.M.'s mother as it was upon C.M.'s ability to develop and apply adequate parenting skills in supervising and caring for her son, for it was C.M.'s inability to carry out these functions that was the precipitating cause of M.M.'s neglect. Thus, whether C.M.'s mother continued to live with C.M. or not, it was incumbent upon C.M. to exercise proper supervision of her son and to develop and apply those skills learned in her parenting classes. These conditions were not only reasonable but, given the circumstances of this case, were indispensable to the establishment of a satisfactory parent-child relationship between C.M. and M.M. The court was under no obligation to modify or eliminate these conditions, and its failure to do so did not affect the termination order.
VIII.
 C.M. claims that there was insufficient evidence to support the termination order because the court failed to require the department to implement less drastic alternatives to termination. We reject this contention.
 Prior to July 1, 1977, there were no specific statutory criteria for an order of termination predicated on a dependency petition filed on or before that date. Section 19-3-111(2)(a), 8 C.R.S. (1973), merely stated in this respect that "[t]he court may enter a decree terminating all parental rights of one or both parents in the child when it finds that the best interests and welfare of the child so require." Our case law, however, recognized that the significance of the parent-child relationship was such that certain conditions must be satisfied before an order of termination could be properly entered, including an express consideration of less drastic alternatives and a specific elimination of these alternatives. People in the Interest of E.A., 638 P.2d 278 (Colo.1982); People in the Interest of C.S., 200 Colo. 213, 613 P.2d 1304 (1980); People in the Interest of M.M., 184 Colo. 298, 520 P.2d 128 (1974). 9 In 1977 the legislature enacted section 19-11-105, 8B C.R.S. (1986), and adopted specific criteria to be applied in termination proceedings predicated on dependency petitions filed on or after July 1, 1977. Section 19-11-105(1) states, in pertinent part, as follows:
 The court may order a termination of the parent-child legal relationship upon the finding ...
 (b) That the child is adjudicated dependent or neglected and all of the following exist:
 (I) That an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents or has not been successful or that the court has previously found, pursuant to section 19-3-111(1)(e), that an appropriate treatment plan could not be devised;
 (II) That the parent is unfit;
 (III) That the conduct or condition of the parent or parents is unlikely to change within a reasonable time.
 Although section 19-11-105 does not require a trial court to make an express finding that less drastic alternatives have been considered and eliminated, we are convinced that a trial court's consideration and elimination of these alternatives are implicit in the statutory criteria for termination. Before an order for termination can be entered on the basis of a prior dependency

adjudication, the court either must devise an appropriate treatment plan or must have previously found that an appropriate treatment plan could not be devised. § 19-11-105(1)(b)(I), 8B C.R.S. (1986). An appropriate treatment plan in this context means a plan "which is reasonably calculated to render the particular respondent fit to provide adequate parenting to the child within a reasonable time and which is relative to the child's needs." § 19-3-111(1)(e)(II), 8B C.R.S. (1986). In our view, the court's duty to determine in the first instance whether a treatment plan can be devised and, if so, to approve a plan reasonably calculated to provide the parent with adequate parenting ability involves a consideration of alternatives less drastic than termination.
 That the consideration and rejection of less drastic alternatives are implicit in the statutory scheme is also apparent from a consideration of the express statutory findings which are essential to an order of termination. When an appropriate treatment plan has been devised by the court incident to a dependency adjudication, an order of termination can be entered only when the court expressly finds (1) that the treatment plan has not been reasonably complied with by the parent or has not been successful, (2) that the parent is unfit, and (3) that the conduct or condition of the parent is unlikely to change within a reasonable time. § 19-11-105(1)(b)(I), (II) and (III), 8B C.R.S. (1986). A determination of parental unfitness and the unlikelihood of a change in that condition must be supported by a more particularized finding that "continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious injury to the child or that the conduct or condition of the parent or parents renders the parent or parents unable or unwilling to give the child reasonable parental care." § 19-11-105(2), 8B C.R.S. (1986). Furthermore, section 19-11-105(2), 8B C.R.S. (1986), requires the court to consider but not necessarily limit itself to the following factors in making determinations of parental "unfitness, conduct, or condition:"
 (a) Emotional illness, mental illness, or mental deficiency of the parent of such duration or nature as to render the parent unlikely within a reasonable time to care for the ongoing physical, mental, and emotional needs of the child;
 (b) Conduct towards the child of a physically or sexually abusive nature;
 (c) History of violent behavior;
 (d) A single incident of life-threatening or gravely disabling injury or disfigurement of the child;
 (e) Excessive use of intoxicating liquors or controlled substances, as defined in section 12-22-303(7), C.R.S., which affect the ability to care and provide for the child;
 (f) Neglect of the child;
 (g) Long-term confinement of the parent;
 (h) Injury or death of a sibling due to proven parental abuse or neglect;
 (i) Reasonable efforts by child-caring agencies which have been unable to rehabilitate the parent or parents.
 In considering the above factors, the court is required to give primary consideration "to the physical, mental, and emotional conditions and needs of the child." § 19-11-105(3), 8B C.R.S. (1986).
 Clearly, adherence to the statutory criteria for termination requires a trial court to consider less drastic alternatives and to reject those alternatives as unavailing before entering an order of termination. Although we urge trial courts to enter specific findings on less drastic alternatives in order to avoid any uncertainty about these aspects of the case, we are satisfied that as long as the trial court's findings conform to the statutory criteria for termination and are adequately supported by evidence in the record, a reviewing court may reasonably presume that, in the absence of any indication in the record to the contrary, the trial court considered and eliminated less drastic alternatives.
 In this case the trial court's findings conform to the statutory criteria for termination in section 19-11-105 and are adequately supported by evidence in the

record, thereby permitting us to presume less drastic alternatives were considered and eliminated during the proceedings leading up to the termination order. We need not rely, however, solely on that presumption in resolving C.M.'s claim. The termination order itself contained a specific finding that "permanent foster care would not be in the minor child's best interests, nor would it serve any purpose." The court's finding in this respect is supported by the record. Dr. Jones testified that termination and adoption would be preferable to long-term foster care involving continued visitation between C.M. and M.M. In the doctor's opinion, M.M.'s need to maintain contact with C.M. was secondary to his primary needs of consistent and reliable parenting on a day-to-day basis and the development of affectional bonds with his primary caretaker. There can be no question, therefore, that a less drastic alternative was considered and eliminated by the court. 10
IX.
 C.M.'s last claim is that the trial court erred in striking from the termination order the provision authorizing continued contact between C.M. and M.M. We are satisfied that the trial court did not err in disallowing any further contact between C.M. and her son.
 Section 19-1-103(26), 8B C.R.S. (1986), states:
"Termination of the parent-child legal relationship" means the permanent elimination by court order of all parental rights and duties, including residual parental rights and responsibilities as provided in section 19-11-108. 11
 Section 19-1-103(24), 8B C.R.S. (1986), states that residual parental rights and responsibilities include the right to reasonable visitation. It follows from these two statutes that termination includes the elimination of any right of continued visitation between parent and child. To the extent that the original order for continued contact might be construed as granting C.M. a right to continued visitation over a period of several years regardless of M.M.'s adoptive status, it would be at odds with the termination of the parental relationship.
 Moreover, section 19-4-107(1)(a), 8B C.R.S. (1986), renders a child available for adoption upon an order terminating the parent-child relationship. A decree of adoption divests the natural parents "of all legal rights and obligations with respect to the child," § 19-4-113(2), 8B C.R.S. (1986), and the child is thereafter treated in all respects as if he were a child born in lawful wedlock to the adoptive parents, § 19-4-113(1), 8B C.R.S. (1986). Although the trial court in its discretion might have authorized the department to allow continued contact between C.M. and M.M. as long as M.M. had not yet been adopted, it did not condition the continued-contact provision on M.M.'s adoptive status. The provision authorizing continued visitation over the next few years could well have had the effect of depriving any future adoptive parents of full control over any decision regarding whether any contact should be allowed between C.M. and M.M. By striking this provision, the trial court removed this impediment to adoption. In the event M.M. is adopted, his adoptive parents will have the right to determine whether it is in his best interests to maintain contact with C.M.
 The judgment is affirmed.
1 This appeal was originally filed in the court of appeals, but was transferred to this court pursuant to section 13-4-102(1)(b) and 13-4-110, 6 C.R.S. (1973), because of the appellant's constitutional challenge to section 19-11-103, 8B C.R.S. (1986).
2 The department was originally contacted concerning M.M.'s older brother and sister, W.M. and R.M. These children, however, were placed out of state with their natural father in 1983, and this appeal does not involve them.
3 Pursuant to section 19-3-102(3), 8B C.R.S. (1986), the dependency proceeding contained the following statement:
Termination of the parent-child legal relationship is a possible remedy available if this petition alleging that a child is neglected or dependent is sustained. A separate hearing must be held before such termination is ordered. Termination of the parent-child legal relationship means that the child who is the subject of this petition would be eligible for adoption.
As the factual basis for M.M.'s alleged dependency, the original petition alleged that M.M. was homeless, without proper care, through no fault of the parent. The original petition was subsequently amended in 1983. The amendment, in addition to incorporating the prior allegation of dependency, stated that M.M. lacked proper care through the actions or omissions of C.M., that M.M. was beyond the control of C.M., and that C.M. fails or refuses to provide the proper necessary care for M.M.'s health or well-being.
4 Although we find no constitutional violation in this case, we express our disapproval of the department's delayed filing of the motion for termination and the belated service of the motion on C.M.'s attorney. Since the department knew on June 14, 1984, that the termination hearing had been set for October of that year, it had no legitimate reason for putting off the filing of the motion until thirty-three days before the hearing. Furthermore, once the motion was filed, it should have been promptly served, as we discuss in Part III of the opinion.
5 C.R.C.P. 5(a) states:
Except as otherwise provided in these rules, every order required by its terms to be served, every pleading subsequent to the original complaint unless the court otherwise orders because of numerous defendants, every paper relating to discovery required to be served upon a party unless the court otherwise orders, every written motion other than one which may be heard ex parte, and every written notice, appearance, demand, offer of judgment, designation of record on appeal, and similar paper shall be served upon each of the parties. No service need be made on parties in default for failure to appear except that pleadings asserting new or additional claims for relief against them shall be served upon them in the manner provided for service of summons in Rule 4.
6 To interpret the term "paper" in C.R.C.P. 5(d) to refer only to papers "relating to discovery" in C.R.C.P. 5(a) would result in reading the phrase "and similar paper" out of C.R.C.P. 5(a). Fed.R.Civ.P. 5(a) is virtually identical to C.R.C.P. 5(a). In the context of Fed.R.Civ.P. 5(a), inclusion of the phrase "and similar paper" was "an attempt by the draftsmen to avoid a restrictive interpretation on the rule's specific list of papers, which is not intended to be exhaustive." C. Wright and A. Miller, Federal Practice and Procedure: Civil § 1143, at 577 (1969 and 1985 Supp.); see also 2 J. Moore and J. Lucas, Moore's Federal Practice p 5.04, at 5-16 to 5-17 (2d ed. 1986). Significantly, the phrase "every paper relating to discovery required to be served upon a party unless the court orders otherwise" was added after the original adoption of Fed.R.Civ.P. 5(a) in order to make it clear that such discovery papers were included within the language of the rule. See C. Wright and A. Miller, supra, at 578-79; J. Moore and J. Lucas, supra, at 5-14 to 5-15. It is clear, therefore, that at least in the context of Fed.R.Civ.P. 5(a), "paper" is not limited to discovery papers. The term "paper" encompasses those types of paper listed as well as "similar paper." C. Wright and A. Miller, supra, at 575-76.
Examples of situations to which C.R.C.P. 5(d) applies include the filing of an answer under C.R.C.P. 12(a), which makes no provision for service, and the filing of a motion for post-trial relief under C.R.C.P. 59(b), which again simply provides for the filing of the motion without reference to service. See R. Hardaway and S. Hyatt, Colorado Civil Rules Annot. § 5.5, at 35 (1985).
7 The right to equal protection of the laws is included within due process of law under article II, section 25 of the Colorado Constitution. E.g. Heninger v. Charnes, 200 Colo. 194, 613 P.2d 884 (1980).
8 As already noted, C.R.J.P. 1 provides that the Colorado Rules of Civil Procedure shall apply to those juvenile proceedings not expressly governed by the juvenile rules in the Colorado Children's Code. As discussed in the text, although section 19-3-105(2), 8B C.R.S. (1986), authorizes the appointment of a guardian ad litem in cases of a parent who is adjudicated mentally ill and a parent who is developmentally disabled, we do not read that statute as the exclusive source of the court's authority in such a matter. Hence, we consider it appropriate to look to C.R.C.P. 17(c) in analyzing the issue before us.
9 Requiring a court to give adequate consideration to less drastic alternatives before entering an order of termination gives due deference to the constitutional interest of the parent in preventing the irretrievable destruction of the parental relationship and ensures that the extreme remedy of termination will be reserved for those situations in which there are no other reasonable means of preserving the relationship. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); People in the Interest of A.M.D., 648 P.2d 625 (Colo.1982); People in the Interest of E.A., 638 P.2d 278 (Colo.1982).
10 In a related argument, C.M. contends that the state's failure to explore and eliminate less drastic alternatives to termination was due to her socio-economic status and thus deprived her of equal protection of the laws. C.M.'s argument, as we understand it, seems to proceed as follows: that less drastic alternatives were not employed and her parental rights were accordingly terminated because she lacked an extended family and adequate financial resources to provide a substitute caretaker; that there is no rational distinction between her socio-economic situation and a parent who is provided financial assistance by the government for food, medical services, and other needs of her natural children; that equal protection of the laws, therefore, has been violated. C.M.'s argument is unsupported in either fact or law. In the first place, the state did pursue less drastic alternatives as noted in the text. Second, neither C.M.'s lack of an extended family nor her economic condition was an operative factor in the termination of her parental relationship with M.M. The order of termination was based on C.M.'s failure or inability to comply with the treatment plan, her parental unfitness by reason of her failure or inability to provide for the needs of M.M., and the unlikelihood of her conduct or condition changing in the reasonably foreseeable future. Finally, there are obvious differences between persons, on the one hand, who are adequate parents but who need financial assistance in providing for the children's needs and, on the other, persons who are unable to properly care for their children in the first instance.
11 Section 19-11-108, 8B C.R.S. (1986), provides as follows:
(1) An order for the termination of the parent-child legal relationship divests the child and the parent of all legal rights, powers, privileges, immunities, duties, and obligations with respect to each other, but it shall not modify the child's status as an heir at law which shall cease only upon a final decree of adoption.
(2) No order or decree entered pursuant to this article shall disentitle a child to any benefit due him from any third person, including, but not limited to, any Indian tribe, any agency, any state, or the United States.
(3) After the termination of a parent-child legal relationship, the former parent is not entitled to any notice of proceedings for the adoption of the child by another, nor has he any right to object to the adoption or to otherwise participate in such proceedings.