21CA0023 Peo in Interest of SiOG 10-21-2021 COLORADO COURT OF APPEALS Court of Appeals No. 21CA0023 City and County of Denver Juvenile Court No. 19JV894 Honorable D. Brett Woods, Judge The People of the State of Colorado, Appellee, In the Interest of Si.O.G. and S.M.G., Children, and Concerning M.M.V. and S.O.G., Appellants. JUDGMENT AFFIRMED Division VII Opinion by JUDGE NAVARRO Grove and Pawar, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced October 21, 2021 Kristin M. Bronson, City Attorney, Laura Grzetic Eibsen, Assistant City Attorney, Denver, Colorado, for Appellee Barry Meinster, Guardian Ad Litem Patrick R. Henson, Office of Respondent Parents’ Counsel, Chelsea A. Carr, Office of Respondent Parents’ Counsel, Denver, Colorado, for Appellant M.M.V. Pamela K. Streng, Office of Respondent Parents’ Counsel, Georgetown, Colorado, for Appellant S.O.G. 
1 ¶ 1 In this dependency and neglect proceeding, S.O.G. (father) appeals the juvenile court’s judgment terminating his parent-child legal relationship with S.M.G., and M.M.V. (mother) appeals the juvenile court’s judgment terminating her parent-child legal relationship with S.M.G. and Si.O.G (the children). The parents contend that the juvenile court erred by determining that termination was in the children’s best interests, as opposed to a less drastic alternative. We disagree and affirm. I. Background ¶ 2 In May 2019, the Denver Department of Human Services received a report that S.M.G. tested positive for methamphetamine at birth. The child was also born premature and required treatment in a neo-natal care unit. Mother admitted to using methamphetamine and to having a relapse while pregnant. She asserted that she relapsed after father shot her in the hand. Father was arrested on criminal charges related to the shooting and remained incarcerated throughout the case. ¶ 3 In June 2019, after S.M.G. was discharged from the hospital, a Department caseworker attempted many home visits to check on 
2 the children, without success.1 The Department filed a motion for temporary protective custody of the children, which the juvenile court granted. ¶ 4 The Department later filed a petition in dependency and neglect alleging, among other things, that the children were homeless, without proper care, or not living with either parent through no fault of the parents. Father and mother admitted the allegations, and the court adjudicated the children dependent or neglected. The court adopted treatment plans for both parents. ¶ 5 The children were placed together in foster care, where they remained throughout the case. The record indicates that father’s fiancée asked to be considered a placement for the children in October 2019, but she did not have stable housing. The Department approved the paternal grandmother’s home for placement in January 2020. At that time, however, the paternal grandmother “said that she was not able to take care of the two kids.” The Department and guardian ad litem objected to moving the children to the fiancée or paternal grandmother. 1 Although father’s name appears on Si.O.G.’s birth certificate, Si.O.G. is not father’s biological child. 
3 ¶ 6 The court set a contested placement hearing for January 2020, but father agreed to “continue [the] matter until after his criminal trial [was] completed . . . [in] March.” Mother, via her counsel, agreed with this plan. By February 2020, the fiancée had moved in with the paternal grandmother, and the paternal grandmother told the Department she now wanted to be considered as a placement for the children. The paternal grandmother started participating in supervised visitation with the fiancée. Later, however, the paternal grandmother requested separate visits from the fiancée. ¶ 7 The record does not indicate that the contested placement hearing occurred in March. In May, father’s counsel asked that the hearing be continued to August 2020, stating that “the proposed placement has not really had an opportunity to get to know the kids or to really visit them.” The court granted the continuance. ¶ 8 Meanwhile, in June 2020, the Department filed a forthwith motion to discontinue the children’s visits with the paternal grandmother and fiancée. The court suspended visits temporarily and set a contested visitation hearing. After that hearing, the court concluded that the paternal grandmother and fiancée should be 
4 allowed in-person visitation, with a parent-coach present, in advance of the contested placement hearing. ¶ 9 The contested placement hearing was held in September 2020. The juvenile court, considering the children’s “medical, physical, emotional and other specific needs,” denied the request to move the children. The court also ordered that visitation continue with the fiancée and paternal grandmother. ¶ 10 Also in September 2020, the Department filed motion to terminate the parents’ parental rights, alleging that their treatment plans were not successful. After a hearing, the court granted the motion. II. Less Drastic Alternatives ¶ 11 Neither parent disputes that the Department proved each of the statutory elements for termination of their parental rights. See 19-3-604(1)(c), C.R.S. 2020. Instead, both parents contend that the juvenile court did not properly consider less drastic alternatives. ¶ 12 Mother asserts that the court erroneously relied on a previous finding made pursuant to section 19-3-702, C.R.S. 2020, in lieu of a finding pursuant to section 19-3-604(3). Father asserts that approved placements existed that “would maintain family ties and 
5 foster the child’s culture, heritage, and sibling relationships.” We perceive no error on the court’s part. A. Relevant Law and Standard of Review ¶ 13 When considering termination under section 19-3-604(1)(c), the juvenile court must also consider and eliminate less drastic alternatives to termination. People in Interest of M.M., 726 P.2d 1108, 1122 (Colo. 1986). This determination is implicit in, and thus intertwined with, the statutory criteria for termination. People in Interest of L.M., 2018 COA 57M, ¶ 24. If the juvenile court’s findings “conform to the statutory criteria for termination and are adequately supported by evidence in the record, a reviewing court may reasonably presume that, in the absence of any indication in the record to the contrary, the [juvenile] court considered and eliminated less drastic alternatives.” People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 41. ¶ 14 The court must give primary consideration to the child’s physical, mental, and emotional conditions and needs. § 19-3-
604(3); A.M., ¶ 20. Thus, the court may consider whether an ongoing relationship with the parent would be beneficial or detrimental to the child and the child’s need for permanency when 
6 determining whether there is a viable alternative to termination. L.M., ¶ 29. Indeed, the primary and controlling issue in termination proceedings is the determination of what will serve the child’s interests and welfare. A.M., ¶ 20. ¶ 15 Moreover, even where a less drastic alternative exists and would be adequate, if the court considers the alternative “in connection with its overall consideration of the statutory criteria for termination and finds that termination is in the child’s best interests, it must reject the alternative and order termination.” Id. at ¶ 32; see also id. at ¶ 1. ¶ 16 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. See id. at ¶ 15. A determination of the proper legal standard to be applied in a case and the application of that standard to the particular facts of the case are questions of law that we review de novo. M.A.W. v. People in Interest of A.L.W., 2020 CO 11, ¶ 31. ¶ 17 We will not disturb the court’s factual findings and conclusions when they are supported by the record. Id. at ¶ 32; see also A.M., ¶ 15. The credibility of the witnesses as well as the 
7 sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions to be drawn from it are within the juvenile court’s discretion. People in Interest of C.A.K., 652 P.2d 603, 613 (Colo. 1982). Our supreme court has emphasized that a juvenile court’s “determinations regarding permanent placement and its determination that termination was in the child’s best interests” are factual findings entitled to deference, unless unsupported by the record. A.M., ¶ 48. B. Analysis ¶ 18 The juvenile court concluded that there were no less drastic alternatives to termination that were in the children’s best interest. In its oral findings, the juvenile court gave the following reasons for this conclusion: (1) information received at the September 2020 contested placement hearing indicated that the children’s placement with the paternal grandmother and fiancée was not in the children’s best interest (2) father’s potential return home to the fiancée and paternal grandmother was a concern because of how father’s unresolved domestic violence issues could negatively affect the children; and (3) there were legitimate concerns about father’s motivations for placing the children with the fiancée and paternal 
8 grandmother; specifically, that this placement would assist father in resolving his criminal case. The evidence amply supports the court’s determination. ¶ 19 First, we do not agree with mother that the juvenile court erred by incorporating its findings from the placement hearing into its factual findings at the termination hearing. The court took proper judicial notice of its prior findings and orders. See People in Interest of O.J.S., 844 P.2d 1230, 1233 (Colo. App. 1992) (a court may take judicial notice of its own file, its findings of fact, and its conclusions of law). Furthermore, the court differentiated between the findings required at the contested placement hearing and those related to a less drastic alternatives determination. ¶ 20 Second, at the contested placement hearing, the court considered the fact that the children “haven’t been placed with [the fiancée and paternal grandmother] throughout the case” when it determined that the fiancée and paternal grandmother were not appropriate placements for the child. The Department previously determined that the fiancée, on her own, could not be an appropriate placement for the child because “her housing was an issue.” Similarly, although the Department approved the paternal 
9 grandmother as a placement, she repeatedly insisted that she could not physically care for the children on her own. Neither father nor mother points to any evidence indicating that the paternal grandmother’s situation had changed at the time of the termination hearing, nor do they provide any legal argument indicating that the juvenile court could not consider the paternal grandmother’s previous testimony that she could not care for the children alone. Cf. People v. Rios, 43 P.3d 726, 732 (Colo. App. 2001) (a court has discretion to take into consideration its own observations). ¶ 21 Department counsel informed the court that the Department “seriously look[ed]” at the fiancée and paternal grandmother as a placement option where they would reside together with the children in paternal grandmother’s home. At the contested placement hearing, however, the caseworker testified that having two adults and two children in the paternal grandmother’s one-
bedroom home made it “quite snug.” Furthermore, when the fiancée worked, the paternal grandmother would be caring for the children alone, something that she could not physically accommodate. The paternal grandmother previously testified that she did not want the children in daycare. But if the fiancée stopped 
10 working to care for the children full time, the caseworker testified that she would “worry about . . . how they [would] financially provide for the children . . . [and] themselves.” ¶ 22 We note that, while father asserts that the fiancée and paternal grandmother could provide “ties to the child’s culture, heritage, and sibling relationships,” the record supports a finding that the foster parents could adequately provide such ties. The record indicates that the foster parents supported the children’s “black and Spanish roots.” The foster mother testified at the contested placement hearing that the children have “dolls and toys and books that are culturally diverse” and that the family attends a “culturally diverse” church. The foster mother testified that she wanted to make sure that she was “engaging [the children] in being around people of different cultures and ethnicities, especially their own.” She was also open to allowing mother and father to remain in contact with the children. Finally, during the course of the case, mother had another child, who was to be placed in the same foster family. ¶ 23 Third, the juvenile court did not consider placement with the fiancée and paternal grandmother a viable less drastic alternative to 
11 termination because of father’s domestic violence “issues.” Although father had no convictions for domestic violence at the time of the termination hearing, his treatment plan included a domestic violence treatment component. Father was unable to participate in domestic violence therapy while he was incarcerated. Nevertheless, the fiancée testified that she planned to invite father into the home with the paternal grandmother once he was no longer incarcerated. She testified, “once [father] gets out of prison . . . we’re going to be a family.” The caseworker testified, at the contested placement hearing, that she was worried about the fiancée’s safety “and of course if the children were placed with [the fiancée,] the children’s safety” if father were released from jail and lived with the fiancée and paternal grandmother. At termination, no evidence was offered to controvert this testimony. ¶ 24 Finally, the court expressed concern about “possible issues of witness tampering.” Specifically, the court noted that “if the father or the fiancée had the children, that [father] might do better in his criminal case.” The record shows that, at the time of the contested placement hearing, father faced witness tampering charges. The court’s concern was supported by the caseworker’s testimony that 
12 those charges were “part of the reason” that she “did not want to place the children with [the fiancée] and [paternal grandmother].” ¶ 25 In light of the evidence discussed above, the record supports the juvenile court’s finding that termination of mother’s and father’s parental rights, not a less drastic alternative, was in the children’s best interests. Therefore, we do not disturb the court’s determination. III. Conclusion ¶ 26 The judgment is affirmed. JUDGE GROVE and JUDGE PAWAR concur.