The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 19, 2018

**2018COA57**

**No. 17CA0404, *People in Interest of L.M.* — Juvenile Court — Dependency and Neglect — Termination of the Parent-Child Legal Relationship**

In this dependency and neglect proceeding, father appeals the juvenile court judgment terminating his parent-child legal relationships with his children, claiming that the court erred in determining that there was no less drastic alternative to termination. The division holds that under the circumstances of this case, where father was acquitted of the alleged sexual abuse that gave rise to this case, and the termination court did not find by clear and convincing evidence that the abuse occurred, the record does not support the court's decision to terminate father's parental rights.

COLORADO COURT OF APPEALS                                      **2018COA57**

Court of Appeals No. 17CA0404
Larimer County District Court No. 15JV143
Honorable Stephen E. Howard, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of L.M. and M.M., Children,

and Concerning K.M.,

Respondent-Appellant,

and

E.L.,

Respondent-Appellee.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE FURMAN
Ashby and Nieto*, JJ., concur

Announced April 19, 2018

Jeannine Haag, County Attorney, Jennifer A. Stewart, Senior County Attorney,
Fort Collins, Colorado, for Petitioner-Appellee

Claire Havelda, Julie M. Yates, Guardians Ad Litem

Stout Law Firm, LLC, Stephanie Stout, Greeley, Colorado, for Respondent-
Appellant

The Christiansen Law Firm LLC, Dina M. Christiansen, Fort Collins, Colorado,
for Respondent-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2017.

¶ 1    In this dependency and neglect proceeding, K.M. (father) appeals the juvenile court judgment terminating his parent-child legal relationships with his children, L.M. and M.M.

¶ 2    This case poses an unusual situation.  The juvenile court adjudicated the children dependent and neglected, finding by a preponderance of the evidence that father had sexually abused L.M. and that M.M. was suffering secondary trauma as a result of the abuse.  The court granted temporary custody of the children to E.L. (mother) and prohibited father from having any contact with the children during the pendency of this case.

¶ 3    Father's treatment plan was premised on his guilt.  But he was later acquitted in the companion criminal case, and, following the termination hearing, the juvenile court could not find that the assault allegations had been established by clear and convincing evidence.

¶ 4    Even so, the juvenile court terminated father's parental rights. In so doing, it found that there were no less drastic alternatives to termination because the children continued to experience trauma specific to father, which he did not recognize.  On appeal, father challenges this finding.

¶ 5    To address father's challenge, we examine the legal standard for determining whether there is a less drastic alternative to termination. As shown by the record in this case, the standard for considering less drastic alternatives to termination is often intertwined with a determination of whether an appropriate treatment plan can be devised for a parent and whether the parent is fit or can become fit in a reasonable time.

¶ 6    Because the record does not support the juvenile court's decision to terminate father's parental rights, we reverse the judgment and remand.

## I.  The Dependency and Neglect Case

¶ 7    In March 2015, the Larimer County Department of Human Services (Department) became involved in this case after six-year-old L.M. had disclosed that "she woke up to [father] touching her in her private" while she was at his home. L.M. and eight-year-old M.M. primarily lived with mother, but spent overnights at father's home. The juvenile court granted temporary custody of the children to mother and prohibited father from having any contact with them.

¶ 8    In early May 2015, father was criminally charged with aggravated incest in relation to L.M.'s disclosure.

¶ 9      Meanwhile, mother admitted that the children's environment was injurious.  But, father denied the allegations in the petition.  After a multi-day hearing in August 2015, the juvenile court adjudicated the children dependent and neglected, finding by a preponderance of evidence that father had sexually abused L.M. and that M.M. was suffering from secondary trauma as a result of the abuse.

¶ 10     The next month, the court adopted the parties' stipulated treatment plan for father.  The treatment plan required father to (1) participate in a psychosexual evaluation within thirty days and follow any recommended offense-specific treatment and (2) maintain contact with the Department.

¶ 11     Father completed the psychosexual evaluation in June 2016, after the Department authorized a one-way release so that the caseworker could provide information to the evaluator without the evaluator automatically releasing the assessment to the Department.  That same month, the Department moved to terminate the parent-child legal relationships between father and the children.

¶ 12    Two months later, a jury acquitted father of the criminal charge arising from L.M.'s outcry.  Immediately after the verdict, father released the psychosexual evaluation to the Department.

¶ 13    The court held a four-day termination hearing in October and December 2016.  Although the children remained in mother's care, the court concluded that granting permanent custody of the children to her was not a less drastic alternative.  The court then entered a judgment terminating father's parental rights.

## II. Less Drastic Alternative and Termination of Parental Rights

¶ 14    Father contends that the juvenile court erred in terminating his parental rights by determining that there was no less drastic alternative.  We agree that the record does not support the juvenile court's decision to terminate father's parental rights.

### A.  Standard of Review

¶ 15    Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts.  *See People in Interest of S.N. v. S.N.*, 2014 CO 64, ¶ 21.  We will not set aside a juvenile court's factual findings when they have support in the record.  *People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo.

4

2010).  Indeed, the credibility of the witnesses; the sufficiency, probative value, and weight of the evidence; and the inferences and conclusions to be drawn from it are within the juvenile court's discretion.  *Id.* at 249-50.  But, we review the legal conclusions de novo when deciding mixed questions of fact and law.  *State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 12.

B.  Statutory Criteria for Termination of Parental Rights

¶ 16     Termination of parental rights is a decision of paramount gravity affecting a parent's fundamental interest in the care, custody, and management of his or her child.  *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006).  The state must exercise extreme caution in terminating parental rights.  *Id.*  Consequently, a juvenile court must strictly comply with the appropriate standards for termination.  *Id.*

¶ 17     The Children's Code sets forth three separate bases under which the court may terminate the parent-child legal relationship following a child's adjudication as dependent and neglected.  *Id.*; *see also* § 19-3-604(1), C.R.S. 2017.  First, a juvenile court may terminate parental rights when the parent has abandoned the child as defined by section 19-3-604(1)(a).  *K.D.*, 139 P.3d at 700.  When

termination is sought based on abandonment, there is no requirement for the parent to have been provided with a treatment plan. *See* § 19-3-508(1)(e)(I), C.R.S. 2017 (stating that a court may find that an appropriate treatment plan cannot be devised as to a particular parent because the child has been abandoned as set forth in section 19-3-604(1)(a)).

¶ 18 Second, the juvenile court may terminate parental rights when it finds, by clear and convincing evidence, that no appropriate treatment plan can be devised to address the parent's unfitness. § 19-3-604(1)(b). But a determination that no appropriate treatment plan can be devised to address a parent's unfitness is not wide open. Just the opposite — it is limited to very specific circumstances defined by statute. *See* § 19-3-508(1)(e)(I).

¶ 19 A conclusion that no appropriate treatment plan can be devised to address a parent's unfitness may be based on any one of the following:

- the parent's emotional illness, behavioral or mental health disorder, or intellectual and developmental disability of such duration or nature as to render the parent unlikely within a

reasonable time to care for the child's ongoing physical, mental, and emotional needs and conditions;

- a single incident resulting in serious bodily injury or disfigurement of the child;

- the parent's long-term confinement of such duration that the parent is not eligible for parole for at least six years after the date the child was adjudicated dependent or neglected, or in an expedited permanency planning case, the long-term confinement of the parent is of such duration that the parent is not eligible for parole for at least thirty-six months after the date the child was adjudicated dependent or neglected;

- serious bodily injury or death of a sibling due to proven parental abuse or neglect;

- an identifiable pattern of habitual abuse to which the child or another child has been subjected and, as a result of which, a court has adjudicated another child as neglected or dependent based on allegations of sexual or physical abuse, or a court of competent jurisdiction has determined that such abuse has caused the death of another child;

- an identifiable pattern of sexual abuse of the child; or

- the torture of or extreme cruelty to the child, a sibling of the child, or another child of either parent.

§ 19-3-604(1)(b)(I)-(VII).

¶ 20    The court may also find that no appropriate treatment plan can be devised for a particular parent in the following circumstances:

- the parent has subjected another child or children to an identifiable pattern of habitual abuse; and

- the parent has been the respondent in another proceeding under the Children's Code in which a court has adjudicated another child to be neglected or dependent based on allegations of sexual or physical abuse, or a court of competent jurisdiction has determined that such parent's abuse or neglect has caused the death of another child; and

- the pattern of habitual abuse and the type of abuse pose a current threat to the child.

§§ 19-3-102(2), 19-3-508(1)(e)(I), C.R.S. 2017.

¶ 21    Third, the court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an

appropriate, court-approved treatment plan or the plan has not been successful in rehabilitating the parent; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c); *People in Interest of C.H.*, 166 P.3d 288, 289 (Colo. App. 2007). Unlike the other two bases for termination, this provision requires the juvenile court to have first approved an appropriate treatment plan for the parent.

C.  Consideration of Less Drastic Alternatives

¶ 22    When considering termination under section 19-3-604(1)(c), the court must also consider and eliminate less drastic alternatives to termination. *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986). But, this determination is implicit in, and thus intertwined with, the statutory criteria for termination. *See id.* at 1122-23. Indeed, as our supreme court has explained, adherence to the statutory criteria for termination requires a juvenile court to "consider less drastic alternatives and to reject those alternatives as unavailing before entering an order of termination." *Id.* at 1123. We note that in *M.M.*, the supreme court considered the termination criteria under section 19-11-105(1), C.R.S. 1986. Although the termination statute has been relocated, the statutory criteria have

not been significantly altered. *See C.S. v. People in Interest of I.S.*, 83 P.3d 627, 640 n.8 (Colo. 2004).

¶ 23    A court's duty to determine in the first instance whether a treatment plan can be devised and, if so, to approve a plan reasonably calculated to provide the parent with adequate parenting ability involves a consideration of alternatives less drastic than termination. *M.M.*, 726 P.2d at 1123. This is so because the purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention into the family. *Id.* at 1121; *see also People in Interest of K.B.*, 2016 COA 21, ¶ 11.

¶ 24    Thus, an appropriate treatment plan is one that is approved by the court and is reasonably calculated to render the particular parent fit to provide adequate parenting to the child within a reasonable time and that relates to the child's needs. § 19-1-103(10), C.R.S. 2017; *M.M.*, 726 P.2d at 1123. And, the safety concerns identified during the assessment of the family's needs serve as the basis for developing treatment plan objectives. *K.B.*, ¶ 12.

¶ 25 Once a treatment plan has been devised for a parent, a court may only terminate parental rights when, among other things, the court finds that parent unfit and unable to become fit in a reasonable time. *M.M.*, 726 P.2d at 1123. As a result, the determination of whether there is a less drastic alternative to termination will be influenced by a parent's fitness to care for his or her child. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38.

¶ 26 An unfit parent is one whose conduct or condition renders him or her unable to give a child reasonable parental care. *K.D.*, 139 P.3d at 700. Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, mental, and emotional health needs. *Id.* In determining parental fitness, a court may consider many factors, including conduct toward the child of a physically or sexually abusive nature. § 19-3-604(2)(b).

¶ 27 And, as with all termination criteria, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3). Thus, for example, the court may consider whether an ongoing relationship with the parent would be beneficial or detrimental to the child and the child's need

for permanency when determining whether there is a viable alternative to termination. *A.R.*, ¶¶ 38, 41. Nonetheless, a court may not terminate parental rights simply to improve the child's condition. *People in Interest of E.A.*, 638 P.2d 278, 285 (Colo. 1981).

### D. The Juvenile Court's Decision to Terminate Father's Parental Rights

¶ 28 Recall, father completed a psychosexual evaluation in June 2016. The therapist who completed the evaluation recommended that father

1. participate in a pretreatment denier's intervention program if he was found guilty of the sexual offense; and

2. better understand how sexual behaviors negatively impact children by participating in a victim's empathy module.

The therapist also concluded that "contact with [the children] would be contradicted" if father was found guilty of a sexual crime against his children.

¶ 29 Father participated in denier's intervention in October 2016. He produced non-distress results on a specific issue polygraph and his participation in the program therefore concluded. The treatment provider for denier's intervention agreed that it was

12

typical for an individual to complete denier's therapy when he or she provided this result. Likewise, the psychosexual evaluator explained that an individual would not be appropriate for offense-specific treatment when he or she engaged in denier's intervention therapy and passed a non-deceptive polygraph.

¶ 30 Although it was not required by his treatment plan, father had also participated in weekly individual therapy from shortly after the filing of the petition through the termination hearing.

¶ 31 In a very thoughtful and thorough consideration of the evidence, the juvenile court recognized father's participation, albeit delayed, in these services. It also observed that all the allegations in the case arose out of the alleged sexual assault of L.M., which it had found occurred by a preponderance of the evidence in its adjudicatory order. But, the court concluded that it could not find that the sexual assault allegations had been established by clear and convincing evidence. The court even observed that it could not "discount the possibility that no sexual abuse occurred."

¶ 32 Still, the juvenile court concluded that clear and convincing evidence showed that the children were experiencing trauma and the "trauma is specific to [father]." The court found that father

denied and failed to recognize the children's trauma and would not change his attitude. It also determined that empathy was a "key issue" in the case and father had not completed a victim's empathy program as recommend by the psychosexual evaluation.

¶ 33 The court reviewed an evaluation made during the parties' domestic relations case and further concluded that father lacked self-awareness about his anger issues. The court also found that father's lack of recognition that he had done anything wrong would prevent progress in his reunifying with the children. Accordingly, it determined that father was unfit, as he was unable or unwilling to meet the children's needs.

¶ 34 The court also considered whether granting permanent custody of the children to mother was a less drastic alternative to termination. But, it determined that this was not a viable option as (1) the children were fearful and believed the sexual assault happened; (2) father was not ready or able to acknowledge the children's perceptions; and (3) the likelihood or possibility of reunification therapy or future contact with father would not be in the children's best interests and could cause trauma to them.

1. Undetermined Sexual Abuse and Victim Empathy

¶ 35    We first address the juvenile court's conclusion that father had failed to address the children's perception of sexual abuse.

¶ 36    To be sure, the record demonstrates the difficulty in devising a treatment plan to address an allegation of sexual abuse by a parent when the child believes the abuse happened but the parent maintains that he or she did not commit the abuse.  The initial caseworker explained that it was challenging to reunite children with parents who do not acknowledge the children's experience because "the child has a belief this happened, so they are fearful." Likewise, the current caseworker opined that it would be traumatic for the children "to confront an abuser who won't admit that the event happened itself, when the [children] sincerely seem to believe that it did."  She further elaborated that it would invalidate L.M.'s experience to "confront someone who had sexually abused her" and "pretend[] nothing is wrong."

¶ 37    Despite this difficulty, a single incident of sexual abuse (as opposed to a pattern of sexual abuse) is not one of the circumstances in which the Children's Code authorizes a court to terminate parental rights without devising a treatment plan that is

15

calculated to render the parent fit.  *See* §§ 19-3-508(1)(e)(I), 19-3-604(1)(b).

¶ 38    Although the court had approved a treatment plan for father, it required him to complete a psychosexual evaluation and recommended treatment.  The evaluation, in turn, required father to follow Sex Offender Management Board (SOMB) guidelines and protocols.  This requirement continued even though father was ultimately acquitted of the criminal charges related to the sexual abuse allegation.

¶ 39    The SOMB procedures "provide for an evaluation and identification of the adult sex offender and recommend management, monitoring, and treatment based upon existing research and shall incorporate the concepts of the risk-need-responsivity or another evidence-based correctional model." § 16-11.7-103(4)(a), C.R.S. 2017.  The SOMB also develops, implements, and revises, as appropriate,

> guidelines and standards to treat adult sex offenders, including adult sex offenders with intellectual and developmental disabilities, incorporating in the guidelines and standards the concepts of the risk-need-responsivity or another evidence-based correctional model, which guidelines and standards can be used in

the treatment of offenders who are placed on probation, incarcerated with the department of corrections, placed on parole, or placed in community corrections.

§ 16-11.7-103(4)(b).

¶ 40    But, a key provision of the SOMB procedures is that they are designed for sex offenders.  A "sex offender" is designated as a person who is one of the following:

> (I) Convicted in the state of Colorado, on or after January 1, 1994, of any sex offense . . . ; or
>
> (II) Convicted in the state of Colorado on or after January 1, 1994, of any criminal offense, if such person has previously been convicted of a sex offense . . . in the state of Colorado, or if such person has previously been convicted in any other jurisdiction of any offense that would constitute a sex offense . . . , or if such person has a history of any sex offenses . . . ; or
>
> (III) Convicted in the state of Colorado on or after July 1, 2000, of any criminal offense, the underlying factual basis of which involves a sex offense; or
>
> (IV) A juvenile who has committed a sexual offense.

17

§ 16-11.7-102(2)(a), C.R.S. 2017. A person who receives a deferred judgment or deferred sentence for these offenses is also included. § 16-11.7-102(2)(b).

¶ 41 In short, SOMB treatment protocols are geared toward treating individuals who have been convicted of a sexual offense instead of determining whether an individual has committed an alleged sexual offense. Indeed, father's evaluator explained that "offense specific evaluations are really built around the premise of guilt" and that "we don't have tools that determine whether somebody is guilty or innocent, so evaluations such as this are always done under the premise of guilt."

¶ 42 And, the SOMB has processes that therapists and supervising officers, like a caseworker, are to follow when offenders are convicted of a sexual crime before allowing contact with child victims. One part of the process is that the offender is not allowed to have contact with a child until he or she has admitted the offense against the child.

¶ 43 As a result, the record is replete with evidence that no progress was made toward reunification because father had not admitted or acknowledged the abuse. And, father was adamant

that he was not going to admit molesting or abusing the children when he had not done so.

¶ 44     This requirement for treatment placed father in a no-win situation and was not reasonably calculated to render him a fit parent who could meet the children's needs. On the one hand, if, as here, father failed to admit that he had abused L.M., this led to termination on the basis that father had not complied with the treatment plan and was unable to have contact with the children or work toward reunification with them. On the other hand, if father had acknowledged that he had sexually abused L.M., this would also be evidence of his unfitness under section 19-3-604(2)(b).

¶ 45     Moreover, faulting father for not completing treatment that required him to acknowledge sexual abuse of L.M. is incompatible with the juvenile court's conclusion that it could not discount the possibility that no sexual abuse had occurred.

¶ 46     And, there is no indication in the record that father was offered treatment or a path to becoming a fit parent other than to acknowledge that he had sexually abused L.M. In fact, the record offers no indication that father could have taken any steps, short of

admitting that he had sexually abused L.M., to acknowledge the children's perceptions of abuse.

¶ 47 Finally, we recognize that the grounds for adjudicating the children dependent and neglected — the sexual abuse of L.M. — only needed to be established by a preponderance of the evidence. *See People in Interest of J.G.*, 2016 CO 39, ¶ 15. But, for the sexual abuse to serve as a basis for determining that father was unfit, and, thus, there was no less drastic alternative to termination, it needed to be established by clear and convincing evidence. *See* § 19-3-604(1)(c), (2)(b).

¶ 48 For these reasons, the juvenile court's findings regarding father's failure to address the abuse or perceived sexual abuse are insufficient to support its conclusion that there is no less drastic alternative to termination.

2. Other Causes for the Children's Trauma

¶ 49 Next, we turn to the juvenile court's conclusion that father was unwilling to take responsibility for any portion of the children's trauma even if it was related to "other conduct or statements of [father] during or after the divorce proceedings."

¶ 50　　The record undeniably establishes that the children were experiencing significant trauma related to father.  The initial caseworker observed trauma symptoms in the children when they discussed father.  When the criminal trial was approaching, the children, especially L.M., would "shut down" when she discussed visitation with father.  The caseworker also testified that L.M. typically did not want to visit father and was having difficulty in school and sleeping because she was worried about visits.  Thus, she opined that the children were not ready to visit father.  Mother also described exacerbated behaviors by the children.  For example, she described that L.M. would have aggressive outbursts as well as panic attacks and make threats to harm herself and M.M.  In contrast, she described that M.M. would stop verbal communication and grunt or mimic animal sounds.

¶ 51　　The children's therapist stopped working with L.M. on completing a trauma narrative because she could not tolerate the anxiety that it was causing her to write it.  Likewise, a therapist who completed trauma assessments of L.M. and M.M. determined that the children were experiencing trauma symptoms, but had not tried to determine when the traumatic event occurred.

¶ 52    The trauma therapist also opined that the children were experiencing stress from the court involvement.  For example, during the trauma assessment, L.M. was asked to put people who were in her life in a sand tray.  She separated mother's family and father's family.  She placed father's family in the corner with a fence and "indicated that she hated court . . . and put herself on the fence between her mom and dad and indicated that it was her job to make sure that she – everyone was being good."

¶ 53    But, the record is devoid of any indication that father was asked to address any other potential causes of the children's trauma.  For example, the Department made no request (nor was there a court order) for father to participate in evaluations or treatment services to resolve other issues, such as father exhibiting intense anger or making inappropriate statements during the parties' divorce proceeding.

¶ 54    To be sure, the initial caseworker testified that father had not made any admissions to her about his behavior that had impacted his children.  The therapist providing denier's intervention therapy likewise agreed that father had not admitted any abuse or mistreatment of the children.  Nonetheless, the record does not

establish that, apart from the sexual abuse allegation, father was asked about or otherwise unwilling to acknowledge any parental deficiencies that might have contributed to the children's trauma.

¶ 55 We also recognize that the juvenile court faulted father for failing to complete a victim's empathy program as recommended by the psychosexual evaluator. Indeed, the psychosexual evaluator believed that father could benefit from a victim empathy program regardless of whether he had committed the abuse to "thoroughly understand how this has likely impacted the children."

¶ 56 Yet, there is no evidence that the program would have enabled father to develop empathy or otherwise understand the children's needs generally. Rather, the evaluator explained that the victim's empathy module is aimed at "helping a client to better understand how sexual behaviors likely have impacted the victim" and, ideally, "work[ing] a little bit with the actual victim's therapist so that the offender can really learn more about how [his or her] behaviors directly impacted [the] victim." In short, it was to help father "better understand how his sexually abusive behavior . . . directly impacted the children."

¶ 57    Under these circumstances, the juvenile court erred in concluding that father's failure to address other possible issues, and the children's corresponding trauma, demonstrated that he was an unfit parent, and thus, that granting custody of the children to mother was not a viable less drastic alternative to termination.

¶ 58    Accordingly, the termination judgment must be reversed.

### III.  ICWA Compliance

¶ 59    Although not raised by father on appeal, the record does not demonstrate full compliance with the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901 to 1963 (2012).

¶ 60    ICWA's provisions are for the protection and preservation of Indian tribes and their resources and to protect Indian children who are members of or are eligible for membership in an Indian tribe. 25 U.S.C. § 1901(2), (3).  ICWA recognizes that Indian tribes have a separate interest in Indian children that is equivalent to, but distinct from, parental interests.  *B.H. v. People in Interest of X.H.*, 138 P.3d 299, 303 (Colo. 2006); *see also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 52 (1989).  Accordingly, in a proceeding in which ICWA may apply, tribes must have a meaningful opportunity to participate in determining whether the

child is an Indian child and to be heard on the issue of ICWA's applicability. *B.H.*, 138 P.3d at 303.

¶ 61   To ensure tribes have an opportunity to be heard, Colorado's ICWA-implementing legislation provides that in dependency and neglect proceedings, the petitioning party must make continuing inquiries to determine whether the child is an Indian child. § 19-1-126(1)(a), C.R.S. 2017; *see also B.H.*, 138 P.3d at 302.

¶ 62   The Bureau of Indian Affairs (BIA) has also issued regulations and guidelines implementing ICWA that address inquiry and notice. For example, the 2015 guidelines — in effect during the commencement of the termination proceeding — encouraged agencies and courts, in every child custody proceeding, to ask whether the child is or could be an Indian child and to conduct an investigation into whether the child is an Indian child. Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,152 (Feb. 25, 2015). They also reiterated the importance of providing notice to tribes. *Id.*

¶ 63   The BIA has repealed the 2015 guidelines and replaced them with the 2016 guidelines and implemented final regulations. *People in Interest of L.L.*, 2017 COA 38, ¶ 15; Indian Child Welfare Act

Proceedings, 81 Fed. Reg. 38,778 (June 14, 2016); Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016), https://perma.cc/3TCH-8HQM (2016 Guidelines); *see also* Notice of Guidelines, 81 Fed. Reg. 96,476 (Dec. 30, 2016). The 2016 Guidelines and regulations impose a similar duty of inquiry and notice on juvenile courts.

¶ 64 The juvenile court must ask each participant on the record at the beginning of every emergency, voluntary, or involuntary child custody proceeding whether the participant knows or has reason to know that the child is an Indian child. 25 C.F.R. § 23.107(a) (2017); *see also L.L.*, ¶ 19. Termination of parental rights is one type of child custody proceeding under ICWA. 25 U.S.C. § 1903(1) (2012). The inquiry must be made at the commencement of the proceeding and all responses should be on the record. 25 C.F.R. § 23.107(a).

¶ 65 Father was not personally present at the initial hearing when the juvenile court inquired of mother regarding ICWA's applicability. Although the record does not show that the court later made a similar inquiry of father, it asked the parties to address ICWA's applicability at the start of the termination hearing. For reasons

26

that are not clear in the record, father's counsel offered no response to the court's inquiry. Thus, if the court again considers termination of father's parental rights, it must confirm with father whether he knows or has a reason to know or believe that the children are Indian children.

## IV. Conclusion

¶ 66 The judgment is reversed, and the case is remanded to the juvenile court. Before the court may again consider termination of parental rights, it must adopt an appropriate treatment plan under section 19-3-508(1)(e)(I) that relates to the children's trauma and is reasonably calculated to render father a fit parent.

¶ 67 In reaching this holding, we are not unmindful of the difficulty and complexity of the issues faced by the juvenile court in this case and the legitimate concern for the children's trauma and ability to re-establish a relationship with father. But, for the reasons discussed in the opinion, we must reverse the judgment and remand the matter for further proceedings.

JUDGE ASHBY and JUDGE NIETO concur.