23CA1954 Peo in Interest of AF 08-01-2024 COLORADO COURT OF APPEALS Court of Appeals No. 23CA1954 Weld County District Court No. 21JV703 Honorable W. Troy Hause, Judge The People of the State of Colorado, Appellee, In the Interest of A.F., a Child, and Concerning C.T. and A.F., Appellants. JUDGMENT AFFIRMED Division IV Opinion by JUDGE JOHNSON Navarro and Pawar, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 1, 2024 Bruce T. Barker, County Attorney, David S. Anderson, Assistant County Attorney, Greeley, Colorado, for Appellee Debra W. Dodd, Guardian Ad Litem Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant C.T. Patrick R. Henson, Office of Respondent Parents’ Counsel, Justin Twardowski, Office of Respondent Parents’ Counsel, Denver, Colorado, for Appellant A.F.
1 ¶ 1 A.F. (mother) and C.T. (father) appeal the juvenile court’s judgment terminating their parent-child legal relationships with A.F. (the child). We affirm. I. Background ¶ 2 In July 2021, mother moved to Tennessee to live with family. Mother left the then-three-month-old child with father. Father admitted he could not take care of the child and placed her with an acquaintance who lived in Windsor, Colorado. The acquaintance reported that when she picked up the child from father, the child was dirty and had rashes on her body due to improper care by the parents. The Larimer County Department of Human Services began working with the family in August 2021. ¶ 3 Although Larimer County was initially involved with the family, the Weld County Department of Human Services (the Department) later assumed jurisdiction based on the parents’ address. In October 2021, the Department filed a petition in dependency or neglect regarding the child. The Department entered a deferred adjudication as to both parents. ¶ 4 The court approved the Department’s treatment plans for mother and father. In June 2022, the court placed the child with 
2 the maternal great-grandparents in Tennessee, where she lived for the remainder of the case. ¶ 5 In February 2023, the Department revoked the deferred adjudication as to both parents, adjudicated the child dependent or neglected, and re-adopted the previously approved treatment plans. In May 2023, the Department moved to terminate the parents’ parental rights. Around that same time, father filed an objection arguing that the Department had failed to make reasonable efforts to reunify him with the child and provide him with services following his October 2022 incarceration. After a multi-day hearing, the juvenile court denied father’s reasonable efforts challenge and granted the Department’s termination motion as to both parents. ¶ 6 On appeal, mother contends that she was not given a reasonable amount of time to prove parental fitness and that, if provided additional time, she could have fully complied with her treatment plan. Father reasserts his contention that the Department did not provide reasonable efforts to rehabilitate him and reunite the family. Father also asserts a claim of ineffective assistance of counsel because his trial counsel did not timely object 
3 to the Department’s lack of reasonable efforts. And both parents contend that the juvenile court failed to consider less drastic alternatives to termination. II. Standard of Review ¶ 7 Whether the juvenile court properly granted a motion to terminate parental rights presents a mixed question of fact and law because the termination statute must be applied to the evidentiary facts. People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 15. The credibility of witnesses and the sufficiency, probative value, and weight of the evidence, as well as the inferences and conclusions to be drawn from the evidence, are within the juvenile court’s discretion. Id. We will set aside the juvenile court’s factual findings only if they are clearly erroneous because they lack record support. People in Interest of S.R.N.J-S., 2020 COA 12, ¶ 10. We review the court’s legal conclusions de novo. See id. ¶ 8 A juvenile court may terminate a parent’s rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the 
4 parent’s conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2023; People in Interest of C.H., 166 P.3d 288, 289 (Colo. App. 2007). III. Mother’s Contention ¶ 9 Mother contends that the juvenile court did not give her a reasonable amount of time to comply with her treatment plan. We disagree. A. Standard of Review and Applicable Law ¶ 10 An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. People in Interest of D.P., 160 P.3d 351, 353 (Colo. App. 2007). At a minimum, reasonable parental care requires that a parent provide nurturing and protection adequate to meet the child’s physical, emotional, and mental health needs. S.R.N.J-S., ¶ 9. ¶ 11 Before a court can terminate the parent-child relationship, there must be clear and convincing evidence that the parent cannot become fit within a reasonable period of time. § 19-3-604(1)(c)(III). ¶ 12 A reasonable period of time is not an indefinite period of time but must be considered based on the physical, mental, and emotional conditions and needs of the child. People in Interest of 
5 A.J., 143 P.3d 1143, 1152 (Colo. App. 2006). When determining whether a parent may become fit within a reasonable period of time, the “court may consider whether any change has occurred during the pendency of the dependency and neglect proceeding, the parent’s social history, and the chronic or long-term nature of the parent’s conduct or condition.” People in Interest of D.L.C., 70 P.3d 584, 588-89 (Colo. App. 2003). ¶ 13 If a parent has made little to no progress on a treatment plan, the court need not give the parent additional time to comply. See People in Interest of R.B.S., 717 P.2d 1004, 1006 (Colo. App. 1986). When, as here, a child is under six years old, the court must consider the expedited permanency planning (EPP) provisions, which require that the child be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-
702(5)(c), C.R.S. 2023. B. Analysis ¶ 14 The parties dispute whether mother preserved this argument. Even assuming this issue is preserved, we discern no error. ¶ 15 Mother’s treatment plan had six objectives that required her to (1) cooperate with the Department; (2) address any substance abuse 
6 issues; (3) learn additional parenting skills regarding appropriate structure, supervision, care, and discipline; (4) address mental health issues of depression and anxiety; (5) demonstrate a suitable and stable living situation; and (6) demonstrate the ability to provide for the child financially. She contends that she was partially compliant with four of the six objectives and that, if provided additional time, she would remedy her noncompliance. Specifically, she identifies her “positive trajectory” due to three months of clean urinalysis tests, her relocation to Tennessee to be near the child, her compliance with one round of mental health evaluations, and her new job and housing. And she argues that more time would allow her to resolve “the issues that led to the opening of this case.” ¶ 16 The court found that mother failed to “engage in any significant way throughout this case”; she had, “in all essence, abandoned the child”; and she failed to visit the child without good cause. The court also found that mother had not demonstrated she was a fit parent and that she could not become one within a reasonable time that would be “meaningful to the child given her age.” 
7 ¶ 17 The record supports the juvenile court’s findings. Mother had already been provided with an additional year to comply with her treatment plan, so we reject her argument that she was not provided sufficient time to comply. A.J., 143 P.3d at 1152 (periods as short as five to nine months have been held to be sufficient time to comply with a treatment plan). ¶ 18 While in Colorado, mother only attended about half of her scheduled visits with the child, and she missed the final visit before the child was placed in Tennessee. Mother moved to Tennessee, asserting that she wanted to be closer to the child; however, she relocated to Knoxville, four hours away from the child. On two occasions, mother declined bus tickets provided by the Department to visit the child. Mother also declined housing and transportation assistance from her family to be closer to the child, including an initial offer by the maternal great-grandparents to allow mother to live in their home with the child, which was considered by the Department as an option until mother chose to remain in Knoxville. ¶ 19 The caseworker testified that, more than a year after moving to Tennessee, mother’s contact with the Department was sporadic and inconsistent, and that by summer 2022, mother “largely ignored” 
8 the caseworker’s attempts to reach her. Mother participated initially in a mental health and substance abuse evaluation, but when updated evaluations were needed, mother refused to participate. ¶ 20 The caseworker provided mother with information about a parenting class and offered mother assistance to sign up, but mother did not pursue the course. And mother only had three in-
person, fully supervised visits, and three to four video visits with the child. Mother had not seen the child for nearly a year before the termination hearing. The caseworker testified that mother had essentially abandoned the child, could not demonstrate stable housing because mother was “jumping around a lot,” and had never demonstrated the ability to meet the child’s physical, mental, or developmental needs. ¶ 21 Based on this record, we discern no basis to disturb the juvenile court’s findings or its conclusion that mother could not become fit within a reasonable period of time. 
9 IV. Father’s Contentions A. Reasonable Efforts ¶ 22 Father contends that the Department failed to make reasonable efforts to rehabilitate him and reunify him with the child. We disagree. 1. Standard of Review and Applicable Law ¶ 23 Whether a department satisfied its obligation to make reasonable efforts is a mixed question of fact and law. People in Interest of A.S.L., 2022 COA 146, ¶ 8. We review the court’s factual findings for clear error, but we review de novo its legal determination based on those findings. Id. ¶ 24 Before a court may terminate parental rights, the department must make reasonable efforts to rehabilitate parents and reunite families. § 19-3-604(2)(h). Reasonable efforts mean the “exercise of diligence and care” for a child in out-of-home placement. § 19-1-
103(114), C.R.S. 2023. A department satisfies the reasonable efforts standard if services are provided to a parent in accordance with section 19-3-208, C.R.S. 2023. § 19-1-103(114). ¶ 25 Among the services that may be provided are screenings, assessments, and individual case plans for the provision of services; 
10 home-based family and crisis counseling; information and referral services to available public and private assistance resources; visitation services; and placement services including foster care and emergency shelter. § 19-3-208(2)(b). ¶ 26 The juvenile court should consider whether the provided services were appropriate to support the parent’s treatment plan. People in Interest of S.N-V., 300 P.3d 911, 915 (Colo. App. 2011). But the parent is ultimately responsible for using those services to obtain the assistance needed to comply with the treatment plan. People in Interest of J.C.R., 259 P.3d 1279, 1285 (Colo. App. 2011). And the court may consider a parent’s unwillingness to participate in treatment when determining whether a department made reasonable efforts. See People in Interest of A.V., 2012 COA 210, ¶ 12. 2. The Department Made Reasonable Efforts ¶ 27 The juvenile court found that the Department made reasonable efforts to provide father with the services identified in his treatment plan, but father failed to engage in family visitation, mental health and substance abuse treatment, housing services, and parenting classes. Father contends that the Department did 
11 not make reasonable efforts to (1) assist him to overcome his transportation barriers; (2) provide services to improve his communication skills; and (3) arrange family visitation once he was incarcerated. We address each contention in turn. ¶ 28 First, father contends that the Department failed to provide him transportation assistance because it knew that the parents did not initially have a car and, even when they obtained a car, family time was in locations far away, and the Department did not offer rideshare services. But the record supports the Department’s reasonable efforts to address this issue. ¶ 29 To assist with the lack of transportation, the caseworker testified that “if [the parents] had asked for a [family] visit . . . , [she] would’ve accommodated” by taking the child to them. The parents obtained a car in January 2022, eliminating the issue of transportation; however, father continued to miss nearly half of his scheduled visits with the child. Transportation for in-person visits became unnecessary when the child was out of state. Father requested gift cards from the Department for Uber following a car accident in July 2022, but he was told that this was not a service provided by the Department. And at that point, father did not 
12 require transportation assistance because he was no longer doing urinalyses and his parenting classes were online and integrated throughout virtual visitations. ¶ 30 Second, father contends that the Department failed to address issues with his communication, such as renewing individual therapy or neurofeedback. Father, however, did not bring this issue to the attention of the court or a caseworker. See D.P., 160 P.3d at 355 (holding that the parent must bring any perceived deficiency in the department’s efforts to rehabilitate and reunite the family to the trial court’s attention). Father completed an initial mental health evaluation that did not recommend any further treatment. And after father exhibited “poor and explosive behavior” in front of the child, the Department requested a second mental health evaluation, but father refused to participate. ¶ 31 Third, father contends that the Department failed to provide adequate visitation services with the child once the child was placed with her maternal great-grandparents in Tennessee and father was incarcerated. He points to the Department’s failure to set up video calls with the child in Tennessee and its lack of assistance to reduce barriers for visitation, such as having to use the jail’s 
13 Securus system requiring third-party supervision of video visits. We conclude the record supports the Department’s reasonable efforts. ¶ 32 True, father was limited in his ability to obtain services required by his treatment plan due to his incarceration. But the court found that even prior to incarceration, father’s family visits were not regular and consistent, he failed to visit without good cause, and, ultimately, the treatment plan objectives were unsuccessful. ¶ 33 After the child was placed in Tennessee, there was a “standing invitation” for both parents to visit with the child through phone or video. The great-grandmother asserted that father did not take advantage of these opportunities for visitation: “He hasn’t been here. He hasn’t seen her.” ¶ 34 The caseworker and court acknowledged that there was a delay in beginning visitation after father was incarcerated due to difficulty establishing a visitation supervisor. Initially, the great-
grandparents did not want to supervise the visits given past difficult interactions between them and father. In the meantime, the caseworker tried to find visitation workers both in Tennessee and 
14 Colorado; however, she was unsuccessful because visitation workers in Tennessee were unable to contract with the Department, and it was against jail policy to allow a visitation worker to sit with father in the jail during video calls. Because of these challenges, the caseworker worked with father to discuss appropriate interactions during family visitation, and the great-grandparents eventually agreed to supervise the visits. Visits were further delayed because the jail required the great-grandparents to submit to background checks for clearance. Additionally, father had been subject to disciplinary action while in jail, and several appointments were canceled either by the jail or because of father’s failure to attend. ¶ 35 Notwithstanding these delays, the record shows that the Department provided father with visitation services throughout this case, including during his incarceration and when the child was placed in Tennessee. The record supports that the delays beginning family visitation were attributed to external issues outside of the Department’s control. And the caseworker met with father monthly, providing updates and pictures of the child, and worked diligently to set up visitation despite the challenges described 
15 above. The court found the caseworker’s testimony more credible than father’s on this point, and it concluded that the Department was acting in the child’s best interest and that there were unforeseen challenges that the Department remedied as quickly as possible. We see nothing in the record to suggest that the Department unduly delayed visitation or failed to provide services given the challenges faced with father’s incarceration. B. Ineffective Assistance of Counsel ¶ 36 Father also asserts that his counsel was ineffective for failing to make a timely objection to the Department’s lack of due diligence in providing services and visitation following his incarceration. We disagree. 1. Standard of Review and Applicable Law ¶ 37 Divisions of this court have recognized that a parent’s statutory right to counsel includes the right to effective assistance of counsel. See People in Interest of A.R., 2018 COA 177, ¶ 37, aff’d on other grounds sub nom. A.R. v. D.R., 2020 CO 10; People in Interest of S.L., 2017 COA 160, ¶ 58; C.H., 166 P.3d at 290. ¶ 38 In evaluating a claim of ineffective assistance of counsel in a dependency and neglect proceeding, we employ the same test that 
16 we would when evaluating an ineffective assistance of counsel claim in a criminal case. See A.R. v. D.R., 2020 CO 10, ¶¶ 48, 60. Under this test, the parent must establish that (1) counsel’s performance was outside the wide range of professionally competent assistance; and (2) the parent was prejudiced by counsel’s deficient performance — that is, a reasonable probability exists that but for counsel’s unprofessional errors, the outcome of the proceeding would have been different. Id. at ¶ 60. “If the parent fails to establish either prong of this test, the claim fails.” People in Interest of C.B., 2019 COA 168, ¶ 26. ¶ 39 When evaluating counsel’s performance, we must “indulge a strong presumption that counsel’s actions might be considered sound trial strategy.” People in Interest of S.B., 2020 COA 5, ¶ 25, overruled on other grounds by People in Interest of E.A.M. v. D.R.M., 2022 CO 42. ¶ 40 If the parent’s allegations lack sufficient specificity, we may summarily deny the ineffective assistance claim. See C.H., 166 P.3d at 291. In other words, a remand for an evidentiary hearing is only required if the parent’s allegations are sufficiently specific and 
17 compelling to constitute a prima facie showing of ineffective assistance of counsel. Id. 2. No Prima Facie Showing ¶ 41 During closing argument at the termination hearing, the juvenile court asked father’s counsel why a motion asserting a lack of reasonable efforts was not filed earlier in the case. Counsel responded that he had discussed with father whether to do so and father “struggled” with whether to “mak[e] that point” due to his feeling that “anytime he would complain, he would end up in a more precarious position than before.” After other discussions, father and counsel agreed that it was better to just “deal with it at the termination.” ¶ 42 Father does not dispute counsel’s representations or otherwise detail why this tactic, made after consultation with father, constituted deficient performance. Therefore, we conclude that father has not raised sufficiently specific or compelling allegations to constitute a prima facie showing of ineffective assistance of counsel. 
18 V. Less Drastic Alternatives ¶ 43 Both parents assert that the juvenile court erred by rejecting less drastic alternatives to termination. We disagree. A. Standard of Review and Applicable Law ¶ 44 We review a juvenile court’s less drastic alternative findings for clear error. See A.M., ¶¶ 15, 44. ¶ 45 Before terminating parental rights under section 19-3-
604(1)(c), the juvenile court must also consider and eliminate less drastic alternatives. People in Interest of M.M., 726 P.2d 1108, 1122 (Colo. 1986). But that determination is not a separate criterion and is instead “implicit in, and thus intertwined with, the statutory criteria for termination.” People in Interest of L.M., 2018 COA 57M, ¶ 24. In considering less drastic alternatives, a court must give primary consideration to the child’s physical, mental, and emotional conditions and needs. § 19-3-604(3). ¶ 46 For a less drastic alternative to be viable, it must do more than just “adequate[ly]” meet a child’s needs; rather, it must be in the child’s best interests. A.M., ¶ 27. Therefore, if the juvenile court considers less drastic alternatives but still finds that termination is 
19 in the child’s best interests, it must reject the less drastic alternatives and order termination. Id. at ¶ 32. ¶ 47 The juvenile court’s determinations regarding permanent placement and whether termination is in the child’s best interests are factual findings entitled to deference, unless they are unsupported by the record. Id. at ¶ 48; see also People in Interest of B.H., 2021 CO 39, ¶ 80. B. Analysis ¶ 48 At the time of the termination hearing, the child was two and a half years old and had spent most of her life placed outside of the parents’ care. The court considered whether there was a less drastic alternative to termination in the form of an allocation of parental responsibilities (APR) to the great-grandparents, but it found that such an arrangement was not in the child’s best interest. The court noted the great-grandparents’ desire to adopt the child versus acting as custodial caretakers. The court was also mindful that the matter had already been open for two years despite it being an EPP case. The court found that an ongoing relationship with the parents would not be beneficial to the child, see People in Interest of J.L.M., 143 P.3d 1125, 1127 (Colo. App. 2006), and that 
20 the child needed the type of permanency that only an adoption provided her. People in Interest of T.E.M., 124 P.3d 905, 910 (Colo. App. 2005). ¶ 49 Mother contends that permitting additional time for rehabilitation would be a less drastic alternative. As we discussed above, despite extra time, mother failed to comply with her treatment plan. The court considered the importance of stability and permanency, noting that mother’s inconsistency in the young child’s life may cause bonding impediments between the child and her permanent caretaker. ¶ 50 Father contends that an “appropriately crafted APR order,” including “stringent requirements” for his parenting time, would be in the child’s best interests and constitutes a less drastic alternative. Father also asserts that the Department failed to provide evidence that retaining his parental rights was against the best interest of the child or would harm the child in any way. ¶ 51 The court, however, found that, even if the great-grandparents were open to an APR, it was not in the best interest of the child. And the great-grandparents did not want to share custody with the parents, regardless of the restrictions the court might impose as 
21 part of an APR. The court noted that barriers of incarceration further challenged father’s ability to develop a healthy, safe bond with the child. Considering that father failed to establish a healthy and secure bond with the child before incarceration, that he did not have regular and consistent contact with the child, and that he exhibited the same problems addressed in his treatment plan without “adequate improvement,” the court found that adoption was the only proper recourse to address the child’s best interest. ¶ 52 Under these circumstances, we will not disturb the juvenile court’s termination judgment. VI. Conclusion ¶ 53 The judgment is affirmed. JUDGE NAVARRO and JUDGE PAWAR concur.