24CA0639 Peo in Interest of AAQ 11-27-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0639
Jefferson County District Court No. 22JV30212
Honorable Ann Gail Meinster, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of A.A.Q., L.L.Q., L.J.Q., and J.T.Q., Jr., Children,

and Concerning C.L.P. and J.T.Q.,

Appellants.

---

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE GROVE
Freyre and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 27, 2024

---

Kimberly S. Sorrells, County Attorney, Claire M. Czajkowski, Assistant County Attorney, Golden, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem for A.A.Q., L.L.Q., and L.J.Q.

Josi McCauley, Counsel for Youth, Superior, Colorado, for J.T.Q., Jr.

Padilla Law, P.C., Beth Padilla, Durango, Colorado, for Appellant C.L.P.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant J.T.Q.

¶ 1      In this dependency and neglect proceeding, C.L.P. (mother) and J.T.Q. (father) appeal the juvenile court's judgment terminating their parent-child legal relationships with A.A.Q., J.T.Q. Jr., L.L.Q., and L.J.Q. (the children).  We affirm in part and reverse in part, and we remand the case for further proceedings consistent with this opinion.

## I.      Background

¶ 2      In September 2022, the Jefferson County Division of Children, Youth, and Families (Department) received a report that the children were not being brought to school on a regular basis.  The Department later received additional reports concerning mother's alleged substance abuse and father's incarceration.  Based upon the concerns, the Department filed a petition in dependency and neglect.

¶ 3      In the meantime, the children were removed and placed with paternal aunt where they remained for the entirety of the case.

¶ 4      The parents admitted the allegations in the petition and the juvenile court adjudicated the children dependent and neglected. The court then adopted treatment plans for the parents.

¶ 5     Later, the Department filed a motion to terminate parental rights.  After an evidentiary hearing, the court granted the motion.

## II.     Termination Criteria and Standard of Review

¶ 6     The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time.  § 19-3-604(1)(c), C.R.S. 2024.

¶ 7     Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves the application of the termination statute to evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  A determination of the proper legal standard to be applied in a case and the application of that standard to the particular facts of the case are questions of law that we review de novo.  *M.A.W. v. People in Interest of A.L.W.*, 2020 CO 11, ¶ 31.

¶ 8     However, we will not disturb the court's factual findings and conclusions when they are supported by the record.  *Id.* at ¶ 32; *see*

2

*also A.M.*, ¶ 15.  The credibility of the witnesses as well as the sufficiency, probative value, and weight of the evidence, and the inferences and conclusions to be drawn from it are within the court's discretion.  *A.M.*, ¶ 15.

### III.  Father's Arguments

¶ 9  Father asserts the juvenile court erred when it found he had been provided an appropriate treatment plan.  We agree.

### A.  Relevant Law

¶ 10  The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention into the family.  *People in Interest of L.M.*, 2018 COA 57M, ¶ 25.  Therefore, an appropriate treatment plan is one that is approved by the court, relates to the child's needs based on a risk assessment, and provides treatment objectives that are reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time.  § 19-1-103(12), C.R.S. 2024; *People in Interest of K.B.*, 2016 COA 21, ¶ 13.

¶ 11  We measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, which we assess in

light of the facts existing at the time the juvenile court approved the plan. *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005). The fact that a treatment plan is ultimately unsuccessful, however, does not mean that it was inappropriate when approved. *People in Interest of M.M.*, 726 P.2d 1108, 1121 (Colo. 1986).

¶ 12    A parent's incarceration at the time of the adoption or amendment of a treatment plan does not necessarily make it impossible to devise an appropriate treatment plan, but it makes it more difficult to craft "a meaningful and workable [treatment] plan." *People in Interest of M.C.C.*, 641 P.2d 306, 309 (Colo. App. 1982). When devising an appropriate plan in this context, the court should consider "the age of the child, the length of the parent's incarceration, the nature of the parent's criminal conduct, and all the circumstances of the prior parent-child relationship." *Id.*

¶ 13    The parent is responsible for securing compliance with and the success of a treatment plan. *People in Interest of J.M.B.*, 60 P.3d 790, 792 (Colo. App. 2002).

## B.    Additional Background

¶ 14    Father was incarcerated throughout the entire case. Because of this, the Department developed a treatment plan that had two

goals. The first goal required the children to be cared for by safe and substance-free adults who could meet their needs. To meet that goal, the plan required father to, among other things, abstain from using illicit substances, complete a substance use evaluation and follow the recommendations, and submit to random urinalysis (UA) tests. The second goal required that the children be cared for by caregivers who could "meet their individual needs for safety, well-being, and permanency." That required father to maintain contact with the caseworker, ensure that the children's medical and developmental needs were met, participate in family time, attend a parenting class, and maintain employment.

¶ 15 At the dispositional hearing, the juvenile court recognized father was incarcerated and that, as a result, he would be unable to satisfy certain provisions of his treatment plan. The court stated, however, that "[t]hat will not be held against [him]," and "[t]hose elements that are impossible for him to comply with while he is in custody are to be held in abeyance until he is released." The court never clarified which provisions would be held in abeyance. The court then adopted the treatment plan; its provisions were never amended.

¶ 16    Despite the court's acknowledgment of the obstacles caused by father's incarceration, no provisions of the treatment plan were held in abeyance at any point in the case. The Department's court reports routinely indicated father was failing to engage in substance abuse treatment or consistently attend family time, both of which were provisions that were impossible, or at least difficult at times, for father to comply with while incarcerated.

¶ 17    At the termination hearing, the juvenile court found the treatment plan was "reasonable and appropriate, [and] capable of success," but that father had not reasonably complied with it. In doing so, the court also found that father had, "to the best of his ability," done "what he could. He took advantage of what [services] there [were]." Notably, as part of its findings regarding father's unfitness, the court considered father's untreated substance use concerns, domestic violence concerns, outstanding warrants, and criminal history.

## C.    Analysis

¶ 18    We conclude the juvenile court erred. Father's treatment plan was implemented by the court in an inappropriate manner because, when the court failed to hold provisions of his treatment plan in

abeyance as expressly agreed, his noncompliance was essentially assured. *See People in Interest of B.J.D.*, 626 P.2d 727 (Colo. App. 1981) (holding that the trial court erred in ruling the treatment plan was appropriate when the treatment plan failed to take into consideration mother's pregnancy, lack of transportation, and lack of income). The court failed to clarify which parts of father's treatment plan would be held in abeyance given father's incarceration, and later used against father his noncompliance with aspects of his treatment plan that were impossible to comply with while incarcerated. Given this, the likelihood of successful completion with his treatment plan was made virtually impossible. *See B.C.*, 122 P.3d at 1071.

¶ 19   The record reveals, and the Department and guardian ad litem concede, that father engaged in the treatment plan to the best of his ability. Father reported taking the classes available to him while incarcerated and had completed several classes during the case. He reported that he inquired with the facility as to the availability of substance abuse treatment but was unable to take the class because there was a waiting period. Further, he was unable to

7

complete UAs while in the facility. The caseworker acknowledged he was complying with the services available to him.

¶ 20 In support of father's goal to regularly participate in family time, the court eventually ordered the Department to set up visits for father while he was incarcerated. Unknown to the court and the professionals at that time, a criminal protection order prevented father from contacting the children. That protection order was modified to allow contact in November 2023. Following the modification, it appears the Department placed most of the responsibility on father and paternal relatives to set up, pay for, and coordinate family time. While the Department did not supervise or regularly inquire as to how family time went, paternal relatives reported the children enjoyed being able to speak to father. The caseworker testified father spoke to the children approximately weekly; however, lockdowns at the facility occasionally prevented contact.

¶ 21 Regarding concerns about domestic violence, outstanding warrants, and criminal history, there were no provisions in the treatment plan that required father to address these issues. While father's criminal history was related to domestic violence charges,

domestic violence treatment was not a component of his treatment plan nor did the Department offer domestic violence services. The record is also devoid of any mention of any outstanding warrants related to father.

¶ 22 Given this record and under these circumstances, it appears it was impossible for father to participate in substance use evaluation and treatment, UAs, and consistent family time while he was incarcerated. In other words, unless these components of the treatment plan were held in abeyance, father's noncompliance was essentially assured. Moreover, father could not have failed to comply with his treatment plan by not engaging in a service that was not ordered nor by having outstanding warrants when the record reveals he had none.

¶ 23 Accordingly, the judgment terminating the parent-child relationship as to father is reversed, and the case is remanded for further proceedings consistent with this opinion.[1]

---

[1] Because we are reversing the termination judgment as to father, we need not address his other contentions.

9

## IV. Mother's Arguments

### A. Reasonable Efforts

¶ 24 Mother asserts that the juvenile court erred by finding the Department made reasonable efforts to rehabilitate her and reunite her with the children. We discern no basis for reversal.

### B. Preservation

¶ 25 The Department argues that mother failed to preserve her argument about reasonable efforts because she did not raise it before the termination hearing. We need not decide if mother needed to raise a reasonable efforts argument before the termination hearing because, regardless of preservation, the outcome is the same. *See L & R Expl. Venture v. Grynberg*, 271 P.3d 530, 536 (Colo. App. 2011) (declining to resolve an issue where the outcome would not change); *People in Interest of R.R.*, 607 P.2d 1013, 1015 n.2 (Colo. 1979). *Compare People in Interest of S.N-V.*, 300 P.3d 911, 916 (Colo. App. 2011) (parties don't need to raise reasonable efforts argument before a termination hearing), *with People in Interest of D.P.*, 160 P.3d 351, 355-56 (Colo. App. 2007) (reasonable efforts argument is waived if not raised before the termination hearing).

## C. Relevant Law

¶ 26    A department of human services must make reasonable efforts to rehabilitate parents and reunite families before a court may terminate parental rights pursuant to section 19-3-604(1)(c). *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2024. Reasonable efforts means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114). Services provided in accordance with section 19-3-208, C.R.S. 2024, satisfy the reasonable efforts standard. § 19-1-103(114).

¶ 27    Among those services required under section 19-3-208 are screening, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b).

¶ 28    In deciding whether a department has satisfied its reasonable efforts obligation, the juvenile court should consider whether the provided services were appropriate to support the parent's treatment plan. *S.N-V.*, 300 P.3d at 915. The parent is ultimately responsible for using those services to obtain the assistance needed

11

to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). And the court may consider a parent's unwillingness to participate in treatment when determining whether a department made reasonable efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 29 Whether a department of human services satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the court's factual findings for clear error but review de novo its legal determination based on those findings as to whether the department satisfied its reasonable efforts obligation. *Id.*

### D. Analysis

¶ 30 Mother asserts the Department did not engage in reasonable efforts to reunify her and the children because it failed to (1) investigate mother's relatives as a potential placement; (2) provide her with adequate parenting time; and (3) provide her with domestic violence treatment.

¶ 31 We address each argument in turn.

## 1. Relatives as Placement

¶ 32    Mother argues the juvenile court erred by finding the Department made reasonable efforts because it "did not evaluate any relatives as placement."

¶ 33    Contrarily, the record shows maternal aunt *was* investigated for placement when raised as an option by mother, but the Department had concerns about moving the children from the bonded kinship home they had lived in for most of the case.

¶ 34    When the case opened, the children had already been living with paternal aunt for about one month.  Paternal aunt testified she had also cared for the children on and off throughout their lives when mother was unavailable, so the children were familiar with her.  The children reportedly wanted to remain in the home with paternal aunt.  And while mother identified maternal relatives early on as supports, throughout most of the case the record indicates she believed paternal aunt was the best placement option for the children.

¶ 35    Mother did request that placement with maternal relatives be investigated nearly a year after the case began.  In support of this,

13

the caseworker testified she completed a background and fingerprint check and spoke to maternal aunt.

¶ 36 However, the caseworker testified she would not have supported moving the children to another placement that late in the case, as she believed it would be detrimental to them. The children were doing well in the home, paternal aunt was caring for their needs, and they were making progress catching up developmentally and in school. And while the children had sustained injuries while in paternal aunt's care, the Department was aware of the injuries and the caseworker testified she had spoken to paternal aunt and the children about them and had no safety concerns.

¶ 37 The caseworker additionally testified she encouraged maternal relatives to participate in family time even when mother failed to appear for visits and encouraged a relationship between the children and maternal relatives. Notably, maternal relatives never filed to request placement.

¶ 38 We conclude there is record support for the court's findings.

## 2. Parenting Time

¶ 39 Mother argues the Department failed in its duty to provide reasonable efforts because there was a delay in getting family time started and because paternal aunt canceled visits.

¶ 40 While the record shows there were difficulties scheduling the first visit and paternal aunt did have cancellations, the record also shows that most of the missed family time stemmed from mother's failure or refusal to communicate with professionals or attend family time.

¶ 41 As mother correctly points out, there was an almost three-month delay between the case opening and the beginning of family time visits. Some of the missed family time visits were due to the weather or cancellations by paternal aunt. However, the initial delay was also attributable to mother's failure to communicate with the caseworker, her need to run errands, and mother's illnesses.

¶ 42 True, six to seven family time visits were canceled by paternal aunt due to her own illnesses, the children's illnesses, or scheduling conflicts. However, mother additionally cancelled or failed to appear for seven family time visits. Mother refused to move family time to the community, which resulted in the closing of one

family time referral.  At one point, she also demanded a new caseworker and refused to engage or communicate with the current caseworker until her next court date, which resulted in some missed family time.  At another point, she demanded new legal counsel and reported she would not participate in family time until she received new representation, which resulted in a family time referral closure for lack of engagement.  And at times throughout the case, mother was unreachable or delayed responding, which prevented family time from occurring or resuming for periods of up to six months.

¶ 43    The juvenile court found it was mother who prevented much of the family time from occurring.  The record supports the court's conclusion that it was mother's unwillingness to participate, rather than the Department's efforts, that prevented her from engaging in family time.  *A.V.*, ¶ 12.

### 3.    Domestic Violence Treatment

¶ 44    Lastly, mother argues the Department failed in its duty to provide reasonable efforts because it did not include domestic violence services in her treatment plan.  We conclude this error was harmless.

¶ 45    The juvenile court found that mother was unfit, that she had not reasonably complied with her treatment plan, and that the concerns that had opened the case remained unaddressed at the time of termination. Notably, the court found mother did not comply with her treatment plan due to ongoing domestic violence concerns. However, domestic violence treatment was never a component of mother's treatment plan and domestic violence services were never offered to her.

¶ 46    While it was error for the juvenile court to fault mother for her failure to engage in domestic violence services, we are not persuaded that this would have made a difference in the outcome of the case, considering mother's noncompliance with the other aspects of her treatment plan. *See* C.A.R. 35(c) (noting that an "appellate court may disregard any error or defect not affecting the substantial rights of the parties"); *see also People in Interest of E.S.*, 2021 COA 79, ¶ 27 (noting that a lack of reasonable efforts in one area may be harmless "in light of [the parent's] noncompliance with other parts of [their] treatment plan"). In addition to the above findings, the court also found mother had failed to engage in

17

substance abuse treatment, had outstanding warrants, and was responsible for the lack of family time.

¶ 47    The record supports the court's additional findings. Though mother was not referred to domestic violence services, she was referred to dialectical behavioral therapy — a therapy that addresses trauma —- following her intake with a therapeutic provider early in the case, but she failed to participate or further engage in the service.

¶ 48    Mother also failed to engage in any substance abuse treatment or take routine UAs, which her treatment plan required. The caseworker testified mother only completed five UAs, four of which were positive for opiates. While mother completed an intake assessment for substance abuse treatment, the caseworker testified she failed to follow through or engage further.

¶ 49    Testimony further revealed mother had two open warrants at the time of the termination hearing, her communication with the caseworker was often sporadic, and she had never confirmed stable housing or employment with the Department, all of which were tied to her treatment plan components.

## V.     Less Drastic Alternatives

¶ 50     Mother asserts the court erred by finding there were no less drastic alternatives to termination.  We disagree.

### A.     Relevant Law

¶ 51     The juvenile court must consider and eliminate less drastic alternatives before terminating parental rights.  *M.M.*, 726 P.2d at 1122-23.  When making this determination, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  *See* § 19-3-604(3); *K.B.*, ¶ 35.

¶ 52     In deciding whether long-term or permanent placement with a relative or other person is a viable less drastic alternative to termination, the court may consider various factors including whether a permanent placement prefers adoption rather than an allocation of parental responsibilities (APR).  *People in Interest of Z.M.*, 2020 COA 3M, ¶ 31.

¶ 53     For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs.  *A.M.*, ¶ 27.  Rather, the proposed alternative must be the "best" option for the child.  *Id.*  Therefore, if the court considers a less drastic alternative but finds that termination is in the child's best interests, it must reject the

proposed alternative and order termination. *Id.* at ¶ 32. Permanent placement is not a viable less drastic alternative if the child needs a stable, permanent home that can only be assured by adoption. *S.N-V.*, 300 P.3d at 920.

¶ 54 When the juvenile court considers a less drastic alternative and still determines that the termination of parental rights is in the child's best interests, we are bound to affirm that decision if the court's findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

## B. Discussion

¶ 55 Mother asserts the juvenile court erred when it determined there were no less drastic alternatives to termination because the court failed to consider maternal aunt as a less drastic alternative.

¶ 56 The court found there were no less drastic alternatives to termination and termination was in the children's best interests.

¶ 57 The record indicates, as described above, that maternal aunt was investigated as a placement, but the children were ultimately not moved to her home due to concerns about how removing them from a bonded and familiar home would affect their well-being.

20

¶ 58 Additionally, the caseworker and paternal aunt testified that paternal aunt preferred adoption over an APR. The caseworker further testified she believed termination was in the children's best interests, and that the children would have stability, structure, and permanency with their paternal aunt.

¶ 59 Further, the juvenile court found that an APR would not be appropriate and that the children needed the permanency of an adoptive home. Because there is record support for the court's findings, we must affirm. *Id.* at ¶ 80.

## VI. Disposition

¶ 60 The judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

JUDGE FREYRE and JUDGE LUM concur.