24CA1464 Peo in Interest of CKJD 03-06-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1464
Weld County District Court No. 20JV250
Honorable Anita Crowther, Judge

The People of the State of Colorado,

Appellee,

In the Interest of C.K.J.D., a Child,

and Concerning A.Q. and C.D.,

Appellants.

JUDGMENT AFFIRMED

Division A
Opinion by JUDGE GRAHAM*
Román, C.J., and Martinez*, J., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 6, 2025

Bruce T. Barker, County Attorney, David S. Anderson, Assistant County
Attorney, Greeley, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Ainsley Bochniak, Office of Respondent Parents' Counsel, Denver, Colorado, for
Appellant A.Q.

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for
Appellant C.D.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     In this dependency and neglect proceeding, A.Q. (mother) and C.D. (father) appeal the judgment terminating their parent-child legal relationships with C.K.J.D. (child).  We affirm.

## I.     Background

¶ 2     The child was born on May 10, 2020.  Two days later, the Weld County Department of Human Services (Department) received a referral expressing concerns about domestic violence between mother and father.  The caseworker went to the hospital and spoke with mother.  She observed that mother had multiple bruises and a scratch near her right collarbone.  The caseworker also became concerned about possible substance use by the parents.  As a result, the Department filed a petition in dependency and neglect and the child was placed in foster care.

¶ 3     The juvenile court adjudicated the child dependent and neglected and adopted treatment plans for the parents.  Among other things, the parents' treatment plans required them to (1) cooperate and communicate with the Department; (2) address substance abuse issues; (3) learn and use additional parenting skills to meet the child's developmental needs; (4) address mental health concerns; and (5) demonstrate an ability to provide

financially for the child's basic needs. Mother's treatment plan also required her to demonstrate protective parenting capacity and address the high levels of conflict in her relationship with father. Father was further required to cooperate with any criminal case and address conflict and anger issues in his relationship with mother in order to demonstrate safe parenting when the child is in the home.

¶ 4 Three years after the petition was filed, the child was returned to the parents' custody. But two months later, the Department received a referral with concerns about domestic violence between mother and father in front of the child. The caseworker spoke with mother, who reported the details of a domestic violence incident and provided the caseworker with pictures of her injuries. Mother was granted continued temporary custody of the child, and the court ordered that the child not have any contact with father until he contacted the Department and the guardian ad litem (GAL).

¶ 5 Father was later arrested for violating a protection order. At the time of his arrest, mother and the child were with him. Based on this information, as well as mother's social media posts, the Department developed concerns that mother was allowing the child

to have contact with father, in violation of the juvenile court's order. As a result, the child was returned to the foster home.

¶ 6　　In January 2024, the Department moved to terminate both mother's and father's parental rights. After a three-day hearing, the juvenile court granted the motion.

## II.　Termination of Parental Rights

### A.　Applicable Law and Standard of Review

¶ 7　　To terminate a parent's rights, the court must find, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) an appropriate treatment plan has not been reasonably complied with or has not been successful; (3) the parent is unfit; and (4) the parent's condition or conduct is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 8　　Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. *People in Interest of L.M.*, 2018 COA 57M, ¶ 17. A juvenile court's factual findings will not be set aside "unless so clearly erroneous as to find no support in the record." *People in Interest of C.A.K.*, 652 P.2d 603, 613 (Colo. 1982). We review de novo the juvenile court's legal

conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. The credibility of witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn from the evidence are within the discretion of the juvenile court. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.

### B. Compliance with Treatment Plan

¶ 9 Both father and mother contend that the court erred by finding that they did not comply sufficiently with their treatment plan. Father argues that he complied with his treatment plan at multiple points during the case. Mother asserts that, despite barriers, she completed numerous treatment services over a four-year span of the case. We discern no basis for reversal.

¶ 10 It is a parent's responsibility to ensure compliance with, and the success of, the treatment plan. *People in Interest of A.H.*, 736 P.2d 425, 428 (Colo. App. 1987). A treatment plan is successful if it renders a parent fit or corrects the conduct or condition that led to state intervention. *C.A.K.*, 652 P.2d at 611. Partial compliance, or even substantial compliance, may not result in a successful plan that renders the parent fit. *People in Interest of D.M.W.*, 752 P.2d

4

587, 588 (Colo. App. 1987). If a child is under six years old when the petition in dependency and neglect is filed, the court "shall not find" that a parent has reasonably complied with or been successful at a court-approved treatment plan if the parent (1) exhibits the same problems addressed in the treatment plan without adequate improvement and (2) is unable or unwilling to provide nurturing and safe parenting adequate to meet the child's physical, emotional, and mental health needs and conditions. § 19-3-604(1)(c)(I)(B).

### 1.    Father

¶ 11    The juvenile court acknowledged that father completed a substantial amount of work during the four years the case was open. But the court ultimately determined he had not complied with his treatment plan. The court found that the case opened with concerns of domestic violence and substance use and those issues were still present at the time of the termination hearing.

¶ 12    Regarding issues of domestic violence, the court observed that three years after the petition was filed the child returned home to the parents. Just two months later, there was further domestic violence, and the child was removed from father for a second time.

At that time, mother disclosed that additional domestic violence had occurred after the child was returned home.

¶ 13    These findings were supported by the caseworker's testimony detailing mother's statements that, after the child's return home, father beat and strangled her. As a result of this violence, mother had significant bruising, chunks of her hair ripped out, and a broken orbital socket. She told the caseworker she feared for her life. The caseworker was concerned that the child heard, and possibly saw, incidents of domestic violence because he talked about hitting, kicking, and punching, and described seeing blood in his mother's hair. The child's therapist testified to behaviors during the child's play that indicated he had witnessed domestic violence. The court took judicial notice of father's pending criminal charges. Those charges included second degree assault, felony menacing, third degree assault, false imprisonment, child abuse, and thirty-six counts of violation of a protection order. Mother was a named victim.

¶ 14    In terms of father's substance use, the court recognized that father had completed inpatient programs and relapse prevention during which he had become more consistent with taking drug

tests; however, concerns remained regarding his sobriety. The court's findings were supported by the caseworker's testimony about suspicions of a relapse and drug use leading to the incident of domestic violence when the child returned home. Both parents had described to her father's substance use as a trigger for domestic violence, but mother denied any incidents of domestic violence when father was sober.

¶ 15 The court also found that father had not successfully complied with the treatment plan objective requiring him to provide for the child's basic needs, including food, clothing, housing, and access to medical care. True, for most of the case, father had complied with this objective. However, he was in custody at the time of the termination hearing as a result of two criminal cases and was still facing an issue of parole. Therefore, father had not complied with the objective regarding criminal cases nor was he in a position to care for the child.

¶ 16 The court concluded that it had no information as to when father may be able to provide for the child's needs. Father admitted that he was not capable, at that time, of caring for the child.

¶ 17    Because the court's findings regarding father's lack of compliance with his treatment plan are supported by the evidence, we will not disturb them or the court's legal conclusions.

## 2.    Mother

¶ 18    The juvenile court recognized mother's substantial work during the pendency of the case but ultimately determined that she had not complied with her treatment plan.  The court found that mother's treatment plan was put in place to address issues of domestic violence, protective parenting capacity, and sobriety; yet those issues persisted four years later.

¶ 19    The court acknowledged the cycle of domestic violence, and that denial is a part of that cycle.  Nevertheless, the court's concerns regarding mother's ability to protect the child from exposure to domestic violence were not alleviated.  This finding is supported by the evidence.  Specifically, after the child was removed from father's care for a second time, mother retained temporary custody.  The caseworker expressed to mother the need to comply with the juvenile court's order, ensuring the child did not have any contact with father outside of the Department's oversight.  Two months later, mother and the child were seen with father, once

again raising concerns about mother's protective capacity, and the child was removed from mother's care for a second time. The caseworker testified and father admitted that he had contact with the child while mother had temporary custody, in violation of the juvenile court's order.

¶ 20 The court also found that there were ongoing compliance issues regarding mother's use of marijuana and monitored sobriety. Specifically, the court found the child was exposed to controlled substances while in mother's care, and there were indications that mother believed she could continue to use marijuana without affecting the child. In support, the caseworker testified that the child's statements, after his return to the parents and before his second removal from mother, indicated he was exposed to drugs in the home. After the child was removed from the home for a second time, he was given a hair follicle test which was positive for methamphetamine and THC. Due to the timing history, the caseworker concluded that the child was exposed to drugs while in mother's care. When asked, mother could offer no explanation for how the child could have been exposed to such substances. In the termination report, the caseworker noted mother did not show

concern about this positive result or the possible short- and long-term impacts of drug exposure to the child. The record also reflected that mother had the ability to be sober, having submitted negative drug tests; however, when she became stressed, she returned to using marijuana. At the time of the termination hearing, mother was again testing positive for THC and missing drug tests.

¶ 21 Because the court's findings regarding mother's lack of compliance with her treatment plan are supported by the evidence, we will not disturb them or the court's legal conclusions.

### C. Fitness

¶ 22 Mother next asserts that the court erred when it found her unfit. She seems to argue that, because she substantially complied with her treatment plan, she should have been found to be a fit parent. Additionally, she argues that poverty and a lack of resources were the basis for the termination and, if she were given more time to secure employment and housing, she would be a fit parent. We discern no basis for reversal.

¶ 23 In determining parental fitness, the court must consider whether the conduct or condition of the parent renders her unable

or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions. § 19-3-604(2). In determining unfitness, the court may consider whether a parent has been rehabilitated and whether the child has been in foster care for fifteen of the most recent twenty-two months. § 19-3-604(2)(h), (k).

¶ 24    In determining that mother was unfit, the court found that an appropriate treatment plan was adopted, was not reasonably complied with and, most importantly, was not successful. In particular, the court found that after four years there were still concerns regarding mother's ability to protect the child and ensure he was not repeatedly exposed to domestic violence. As discussed above, at one point, mother was in compliance with her treatment plan and the child was returned to her. However, the child was removed again because of an incident of domestic violence and mother's failure to follow the juvenile court's order regarding limitations on the child's contact with father. The caseworker testified that she did not believe mother to be a fit parent due to the ongoing concerns of domestic violence and lack of protection of the

11

child. The psychologist that completed the parental competency evaluation (PCE) stated that mother managed the abusive relationship through "avoidance, including avoiding how it placed her children in an unsafe situation." This expert further discussed how mother minimized the child's trauma and had not gained the awareness necessary to appropriately protect the child.

¶ 25 As noted, mother continued to use substances, including when the child was returned home during the case. The Department's termination report stated, "There have been concerns of [mother's] lack of understanding of the THC use and being sober around her child or having a sober caregiver." It further stated that although mother "had stopped using THC for a few weeks," she reported that "she only did [so] because she thought family time would expand. When [mother] realized family time would not be expanded, she started using THC again."

¶ 26 The court found that, although mother consistently attended family time, her time had not expanded, the child was struggling with transitions, and the prognosis from the experts going forward was discouraging. Mother's family time remained therapeutically supervised, and the child's engagement with mother had not

increased. The caseworker testified that, during transitions for family time, the child was dysregulated, crying, screaming and, at one point, would hide under a chair and repeatedly scream "no." The psychologist testified, "there's so much that's still so severe despite all of the recommendations [she] would normally recommend. And this has gone on for so long, and it still hasn't changed." She concluded that there was no viable path to reunification and that it would be in the child's best interest to discontinue visits. In reaching this conclusion, the psychologist considered the child's reactions to visits as well as mother's "neglectful and parentification dynamics" that continued despite interventions. The child was diagnosed with complex post-traumatic stress disorder (PTSD), and his therapist testified that he had likely been exposed to multiple traumas.

¶ 27 We are not persuaded by mother's argument that she "experienced numerous barriers" to successful completion of her treatment plan. During mother's temporary custody of the child, the caseworker spoke with mother about applying for benefits and attempted to provide clothes and toiletries to mother. The family advocate sent mother a list of extensive resources near her, and the

Department helped with her rent. The Department also obtained a life skills coach for mother to help with resumes, housing, applying for housing, and working with a service that gives cars to parents. The caseworker testified that there were no other services that could be offered to mother that hadn't previously been offered to help her reunify with the child.

¶ 28　Because the court's findings and conclusions that mother is unfit are supported by the record, we will not disturb them on appeal.

### D.　Reasonable Time

¶ 29　Each parent asserts the court erred by finding that they could not become fit within a reasonable time. We disagree.

¶ 30　In determining whether a parent can become fit within a reasonable time, the court may consider whether any changes occurred during the dependency and neglect proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.P.,* 160 P.3d 351, 353 (Colo. App. 2007). A reasonable time is not an indefinite time, and it must be determined by considering the physical, mental, and emotional conditions and needs of the child. *People in*

14

*Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006). When a child is under six years old at the time of filing the petition in dependency and neglect, the juvenile court must consider the expedited permanency planning (EPP) provisions, which require that such children be placed in a permanent home as expeditiously as possible. § 19-1-102(1.6), C.R.S. 2024.

¶ 31 This case was open for 1,521 days, almost the child's entire life. The court found that keeping the case open longer, or allowing the parents additional time, was not in the child's best interest. The court likewise found that the child was struggling. This was evident in the testimony provided by the child's therapist that (1) the child's play involved intrusion, violation, and intense fear indicative of trauma and domestic violence; and (2) the child had regressed to the age of approximately six months.

¶ 32 Multiple professionals testified about the child's need for permanency:

- The expert who completed the parent-child interactional and father's psychological evaluation testified that, from the child's perspective, "time is of the essence, and [f]ather's problems are chronic and slow to change." He further testified that "if

things are continuing down the same path and there's been the same issues . . . he would say that time is up."

- The caseworker testified that the child does not have time to wait and see if mother can get long-term sobriety or the ability to be protective of the child's safety long-term. The caseworker discussed concerns about the long-term effects the trauma would have on the child the longer the case continued without resolution.

- The child's therapist indicated that, without permanency and stability, the child would lack empathy, morality, and consequences to social norms, as well as increased risks of criminality, deviance, and issues in relationships.

¶ 33 Furthermore, the parents had four years to comply with their treatment plans, and although the child had returned home at one point in the case, he was removed from the parents for a second time. In short, the concerns that led to the dependency and neglect action remained at the time of the termination hearing.

¶ 34 Consequently, we conclude that the record supports the juvenile court's finding that the conduct or condition that rendered the parties unfit would not change within a reasonable time.

## E.     Less Drastic Alternatives

¶ 35     Last, we reject mother's contention that the court erred in finding that there were no less drastic alternatives to termination, specifically, allowing mother additional time or granting an allocation of parental responsibilities (APR) to the foster parents.

¶ 36     Implicit in the statutory scheme is a requirement that the juvenile court consider and eliminate less drastic alternatives before terminating parental rights. *People in Interest of M.M.*, 726 P.2d 1108, 1122-23 (Colo. 1986). If a proposed alternative is to be viable, it must not only be adequate, it must be in the child's best interests. *A.M.*, ¶ 27. "[L]ong-term or permanent placement with a family member or foster family, short of termination, may not be a viable less drastic alternative if it does not provide adequate permanence that adoption would provide or otherwise meet a child's needs." *People in Interest of A.R.*, 2012 COA 195M, ¶ 41.

¶ 37     The court determined there were no alternatives short of terminating the parent-child relationship that would adequately serve the child's best interests. The court noted that this is an EPP case and found that keeping the case open or ending the case with an APR would not give the child the stability he needs. The court

considered testimony from the child's therapist regarding the child's complex PTSD diagnosis and extreme reactions to transitions. The court found that the foster parents did not want an APR and were able to provide the child with a permanent home.

¶ 38 The record supports the court's finding. The child needed permanency and stability. The caseworker specifically testified that the child does not have time to wait for mother to comply with her treatment plan. The caseworker opined that an APR to the foster parents would not be in the child's best interests because it would leave open too much ambiguity for the child. The caseworker also testified that the foster parents were not willing to accept an APR. *People in Interest of S.N-V.*, 300 P.3d 911, 920 (Colo. App. 2011) (a juvenile court may consider whether the caregiver favors adoption over an APR).

¶ 39 To the extent mother argues that the court erred by not considering placement with the child's younger siblings as a less drastic alternative, her argument is not supported by the record. Mother asserts that nothing shows that the Department investigated whether the siblings' kinship placement would be an appropriate placement for the child in this case. On the contrary,

the kinship placement for the younger children specifically indicated they were only an option for the two younger children and did not have enough room for this child. Additionally, when the child was removed from mother's care for the second time, the Department indicated that the foster home would be the "least traumatic placement" for the child, but the Department would consider an appropriate placement willing to take all three siblings if found.

¶ 40 We perceive no error in the juvenile court's determinations that no less drastic alternatives existed, and that termination of mother's parental rights was in the child's best interest.

## III. Disposition

¶ 41 We affirm the judgment.

CHIEF JUDGE ROMÁN and JUSTICE MARTINEZ concur.